# STATE OF CONNECTICUT *v.* DAVID G. LIEBENGUTH
## (SC 20145)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The defendant was convicted of breach of the peace in the second degree
in connection with an incident in which he confronted and directed
certain comments and racial slurs at M, an African-American parking
enforcement officer, who, immediately beforehand, had placed a parking
ticket on the defendant's vehicle for being parked in a metered space
without payment. Upon returning to his vehicle and finding the parking
ticket, the defendant confronted M. After M and the defendant exchanged
words, the situation escalated, and the defendant told M that the parking
authority with which he was employed was "fucking unbelievable" and
that he issued the parking ticket because the defendant's car was
"white." The defendant then told M that the actual reason he was given
a parking ticket was because he was white. As the defendant started
to walk away from M, the defendant stated, "remember Ferguson,"
which apparently was a reference to a then recent and highly publicized
shooting of an African-American man by a white police officer in Fergu-
son, Missouri. Thereafter, both M and the defendant returned to and
entered their vehicles, both of which had at least some of their windows
down. M then thought he heard the defendant say the words "fucking
niggers," which caused him to believe that the defendant's earlier com-
ment about Ferguson was a threat meant to imply that what had hap-
pened in Ferguson was going to happen to him. As M was driving away,
the defendant cut through the parking lot in his vehicle, approached
M's vehicle, and then drove past M. As the defendant was driving past

* This case originally was scheduled to be argued before a panel of this
court consisting of Chief Justice Robinson and Justices Palmer, McDonald,
D'Auria, Mullins, Kahn and Ecker. Although Justice McDonald was not
present when the case was argued before the court, he has read the briefs
and appendices, and listened to a recording of oral argument prior to partici-
pating in this decision.

The listing of justices reflects their seniority status on this court as of
the date of oral argument.

State *v.* Liebenguth

M, he looked directly at M with an angry expression and repeated the slur "fucking niggers" louder than he had the first time he uttered it. On appeal to the Appellate Court from the judgment of conviction, the defendant claimed, inter alia, that the evidence was insufficient to sustain his breach of the peace conviction insofar as the racial taunts that he directed at M were protected by the first amendment to the United States constitution and, therefore, could not form the basis of such a conviction. The Appellate Court reversed the defendant's conviction, concluding, inter alia, that the defendant's utterances were unlikely to provoke an immediate, violent response by a reasonable person in M's shoes and, thus, were not prohibited fighting words under the first amendment. On the granting of certification, the state appealed to this court. *Held* that, contrary to the determination of the Appellate Court, the language the defendant used to demean, intimidate and anger M, when considered in the circumstances in which that language was used, constituted fighting words likely to provoke an immediate, violent response from a reasonable person in M's position, and, accordingly, the first amendment did not prohibit the state's use of the defendant's words to obtain his breach of the peace conviction: the defendant's use of the word "niggers," which is inextricably linked to racial prejudice and oppression, and which, when used by a white person as an assertion of the racial inferiority of an African-American person, is highly offensive and demeaning, his use of the profane adjective "fucking" to modify the word "niggers" to emphasize his anger, his continued escalation of the confrontation by approaching M while they were in their vehicles, looking at M with an angry expression as he drove by and repeating the words "fucking niggers," and his use of aggressive hand and bodily gestures and other profanities and racially charged innuendos earlier on in the confrontation all served to incite an immediate, violent response by a reasonable person in M's shoes; moreover, although M, like any parking enforcement officer, undoubtedly was aware that some members of the public might express frustration or anger upon receiving a ticket, and although M did not react violently despite the highly inflammatory and inciting nature of the defendant's words and conduct, this court disagreed that the average African-American parking official would have been prepared for and responded peaceably to the kind of racial slurs and threatening behavior with which M was confronted; furthermore, the fact that the defendant and M were in their vehicles when the defendant used the epithet "fucking niggers" was of no consequence, as the two men were in close proximity to and maintained eye contact with each other, so that each could see and hear each other clearly, and M was in a position to pursue the defendant or to retaliate immediately.

(*Two justices concurring separately in two opinions*)

Argued March 29, 2019—officially released August 27, 2020**

** August 27, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Liebenguth

*Procedural History*

Amended information charging the defendant with breach of the peace in the second degree and tampering with a witness, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, and tried to the court, *Hernandez, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Sheldon* and *Devlin, Js.*, which reversed in part the trial court's judgment and remanded the case to that court with direction to render a judgment of acquittal on the charge of breach of the peace in the second degree, and the state, on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed.*

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Nadia C. Prinz*, former deputy assistant state's attorney, for the appellant (state).

*John R. Williams*, for the appellee (defendant).

*Opinion*

PALMER, J. Under General Statutes § 53a-181 (a) (5), a person is guilty of breach of the peace in the second degree when, with the intent to cause inconvenience, annoyance or alarm, he uses abusive language in a public place.[1] That broad statutory proscription, however, is limited by the free speech provisions of the first amendment to the United States constitution,[2] which prohibit

[1] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (5) in a public place, uses abusive or obscene language or makes an obscene gesture . . . ."

[2] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

The first amendment prohibition against laws abridging the freedom of speech is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. E.g., *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996)

688 JUNE, 2021 336 Conn. 685

State *v.* Liebenguth

the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content''; (internal quotation marks omitted) *Ashcroft* v. *American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002); thereby protecting speech "without regard . . . to the truth, popularity, or social utility of the ideas and beliefs [that] are offered.'' *National Assn. for the Advancement of Colored People* v. *Button*, 371 U.S. 415, 445, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963). These safeguards, however, although expansive, are not absolute, and the United States Supreme Court has long recognized a few discrete categories of speech that may be prosecuted and punished, including so-called "fighting words''—"those personally abusive epithets [that], when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction.'' *Cohen* v. *California*, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971). In this certified appeal, we must determine whether certain vulgar and racially charged remarks of the defendant, David G. Liebenguth, which included multiple utterances of the words "fucking niggers'' directed at an African American parking enforcement official during a hostile confrontation with that official following the defendant's receipt of a parking ticket, were "fighting words'' subject to criminal sanctions. As a result of his conduct, the defendant was arrested and charged with breach of the peace in the second degree in violation of § 53a-181 (a) (5) and, following a trial to the court, was found guilty.[3] On appeal to the Appellate Court,

[3] The trial court also found the defendant guilty of tampering with a witness in violation of General Statutes § 53a-151. See footnote 4 of this opinion. On the charge of breach of the peace in the second degree, the court sentenced the defendant to a term of imprisonment of six months, execution suspended, followed by two years of probation with several conditions, plus a $1000 fine; on the charge of tampering with a witness, the court sentenced the defendant to a consecutive term of imprisonment of four years, execution suspended, followed by four years of probation with the same conditions and a $3000 fine. The defendant's conviction of tampering with a witness, which thereafter was upheld by the Appellate Court; see

State *v.* Liebenguth

the defendant claimed, inter alia, that the evidence was insufficient to support the trial court's finding of guilty because the words he uttered to the parking official constituted protected speech that could not, consistent with the first amendment, provide the basis of a criminal conviction. See *State* v. *Liebenguth*, 181 Conn. App. 37, 47, 186 A.3d 39 (2018). Although acknowledging that the defendant's language was "extremely vulgar and offensive" and "meant to personally demean" the official; id., 53; the Appellate Court, with one judge dissenting, agreed with the defendant that his speech was constitutionally protected and that, consequently, his conviction, because it was predicated on that speech, could not stand. See id., 54; see also id., 58 (*Devlin, J.*, concurring in part and dissenting in part). We granted the state's petition for certification to appeal, limited to the question of whether the Appellate Court correctly concluded that the defendant's conviction must be reversed because the first amendment barred his prosecution for the verbal statements at issue. See *State* v. *Liebenguth*, 330 Conn. 901, 189 A.3d 1231 (2018). We now conclude that the defendant's remarks were unprotected fighting words and, therefore, that his conviction does not run afoul of the first amendment. Accordingly, we reverse the judgment of the Appellate Court in part and remand the case to that court with direction to affirm the trial court's judgment with respect to his conviction of breach of the peace in the second degree.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "Michael McCargo, a parking enforcement officer for the town of New Canaan, testified that he was patrolling the [Morse] Court parking lot on the morning of August 28, 2014, when he noticed that the defendant's vehicle

*State* v. *Liebenguth*, 181 Conn. App. 37, 58, 186 A.3d 39 (2018); is not the subject of this appeal. Unless otherwise noted, all references hereinafter to the defendant's conviction are to his conviction of breach of the peace in the second degree.

State *v.* Liebenguth

was parked in a metered space for which no payment had been made. He first issued a [fifteen dollar parking] ticket for the defendant's vehicle, then walked to another vehicle to issue a ticket, while his vehicle remained idling behind the defendant's vehicle. As McCargo was returning to his vehicle, he was approached by the defendant, whom he had never before seen or interacted with. The defendant said to McCargo, 'not only did you give me a ticket, but you blocked me in.' Initially believing that the defendant was calm, McCargo jokingly responded that he didn't want the defendant getting away. When the defendant then attempted to explain why he had parked in the lot, McCargo responded that his vehicle was in a metered space for which payment was required, not in one of the lot's free parking spaces. McCargo testified that the defendant's demeanor then 'escalated,' with the defendant [having said] that the parking authority was '[fucking] [un]believable' and [having told] McCargo that he had given him a parking ticket 'because my car is white. . . . [N]o, [you gave] me a ticket because I'm white.' As the defendant, who is white, spoke with McCargo, who is African-American, he 'flared' his hands and added special emphasis to the profanity he uttered. Even so, according to McCargo, the defendant always remained a 'respectable' distance from him. Finally, as the defendant was walking away from McCargo toward his own vehicle, he spoke the words, 'remember Ferguson.' '' *State* v. *Liebenguth*, supra, 181 Conn. App. 39–40.

McCargo also testified that, ''[a]fter both men had returned to and reentered their vehicles, McCargo, whose window was rolled down . . . thought he heard the defendant say the words, 'fucking niggers.' This caused him to believe that the defendant's prior comment about Ferguson had been made in reference to the then recent [and highly publicized] shooting of an African-American man by a white police officer in Ferguson, Missouri [on August 9, 2014, approximately three

State *v.* Liebenguth

weeks earlier]. [McCargo] thus believed that the [defendant's reference to Ferguson was a 'threat'] meant to imply that what had happened in Ferguson 'was going to happen' to him. McCargo also believed that, by uttering the racial slur and making reference to Ferguson, the defendant was trying to rile him up and [to] escalate the situation [by 'taking it to a whole other level']. That, however, did not happen, for, although McCargo found the remark offensive, and he had never before been the target of such language while performing his duties, he remained calm at all times and simply drove away to resume his patrol.'' Id., 40. McCargo further testified, however, that, ''[s]hortly thereafter . . . as [McCargo] was driving away, the defendant [cut through the parking lot in his vehicle, approached McCargo, and then] drove past him.'' Id., 40–41. As the defendant was driving past McCargo, ''the defendant turned toward him, looked directly at him with an angry expression on his face, and repeated the slur, 'fucking niggers.' McCargo [also] noted in his testimony that the defendant said the slur louder the second time than he had the first time.

''After the defendant drove out of the parking lot, McCargo [who was shocked and personally offended by the encounter] called his supervisor, who instructed him to report the incident to the New Canaan police. In his report, McCargo noted that there might have been a witness to the interaction, whom he described as a young, white female. The defendant later was arrested in connection with the incident on the charge of breach of the peace in the second degree.'' Id., 41.

''Next to testify was Mallory Frangione, the young, white female witness to the incident whom McCargo had mentioned in his report. She testified that she parked in the [Morse] Court parking lot around 9:45 a.m. on . . . August 28, 2014, and, as soon as she opened her car door, she heard yelling. She then saw two men, McCargo and the defendant, who were standing outside

State *v.* Liebenguth

of their vehicles about seventy feet away from her. She observed that the defendant was moving his hands all around, that his body movements were aggressive and irate, and that his voice was loud. She heard him say something about Ferguson, then say that something was '[fucking] unbelievable.' [Frangione] further testified that she saw the defendant take steps toward McCargo while acting in an aggressive manner. She described McCargo, by contrast, as calm, noting that he never raised his voice, moved his arms or gesticulated in any way. McCargo ultimately backed away from the defendant and got into his vehicle. The defendant, [Frangione] recalled, drove in two circles around the parking lot before leaving. Frangione testified that witnessing the interaction made her feel nervous and upset.''[4] Id.

"After the state rested [its case], the defendant moved for a judgment of acquittal . . . which the court denied. The defendant elected not to testify. The court, ruling from the bench, found the defendant guilty . . . . It reasoned as follows: 'In finding that the defendant's language and behavior [are] not protected speech, the court considers the words themselves, in other words,

---

[4] The evidence adduced at trial also established that, on March 6, 2015, while his criminal case was pending, the defendant sent an e-mail to McCargo's supervisor at the New Canaan Parking Department indicating that he would press felony charges against McCargo and cause McCargo to lose his job if he appeared in court at the defendant's criminal trial and testified against him. See *State* v. *Liebenguth*, supra, 181 Conn. App. 42. The e-mail further stated that the defendant would not take such action against McCargo if he did not appear in court to testify against the defendant. Id. As the Appellate Court explained, "[t]he language of the defendant's e-mail clearly indicates that the defendant intended to induce McCargo not to appear in court, insofar as it stated: 'It goes without mention that if your meter maid [McCargo] does not show up in court this case will be over and everyone can go peacefully on their own way, no harm, no foul, no fallout' and '[p]erhaps the judge will remand him to custody right then and there from his witness chair? Obviously, not if he is not there.' '' Id., 57–58. This evidence provided the basis for the trial court's guilty finding with respect to the charge of tampering with a witness in violation of General Statutes § 53a-151. See footnote 3 of this opinion.

State *v.* Liebenguth

the content of the speech, the context in which [they were] uttered, and all of the circumstances surrounding the defendant's speech and behavior.

" 'The court finds that the defendant's language, fucking niggers directed at . . . McCargo twice . . . is not protected speech. . . . [I]n the American lexicon, there is no other racial epithet more loaded with racial animus, no other epithet more degrading, demeaning or dehumanizing. It is a word [that] is probably the most [vile] racial epithet a non-African-American can direct [toward] an African-American. [The defendant] is white. . . . McCargo is African-American.

" 'In light of this country's long and shameful history of state sanctioned slavery, Jim Crow segregation, state sanctioned racial terrorism, financial and housing discrimination, the word simply has . . . no understanding under these circumstances other than as a word directed to incite violence. The word itself is a word likely to provoke a violent response.

" 'The defendant is not however being prosecuted solely for use of this word. All language must be considered in light of its context.

" 'The court finds that considering . . . the content of the defendant's speech taken in context and in light of his belligerent tone, his aggressive stance, the fact that he was walking [toward] . . . McCargo and moving his hands in an aggressive manner, there's no other interpretation other than these are fighting words.[5]

---

[5] We note that the Appellate Court read this statement by the trial court as reflecting a finding that the defendant took an aggressive stance, was walking toward McCargo, and moving his hands in an aggressive manner at the very same time he uttered the words "fucking niggers." (Internal quotation marks omitted.) *State* v. *Liebenguth*, supra, 181 Conn. App. 49. As the Appellate Court also observed; see id.; such a finding would be inconsistent with the trial testimony, which clearly established that the defendant was seated in his vehicle both times he directed that epithet at McCargo. In contrast to the Appellate Court, however, we do not understand the trial court to have found that the conduct referred to occurred simultane-

State *v.* Liebenguth

And he uttered the phrase not once but twice. It was directed—the court finds that it was directed directly at . . . McCargo. There were no other African-Americans present . . . in the parking lot when it happened, and indeed . . . McCargo's unease and apprehension at hearing those words [were] corroborated by . . . Frangione who . . . said that she felt disconcerted by the defendant's tone of voice and his aggressive stance and actions.' '' (Footnote added.) Id., 43–44.

The defendant thereafter appealed to the Appellate Court, claiming, inter alia, that the evidence was insufficient to support his conviction of breach of the peace in the second degree. Id., 39. Specifically, he maintained that the racial taunts he directed at McCargo were protected by the first amendment and, therefore, could not form the basis of a conviction under § 53a-181 (a) (5). Id., 47. Relying in large measure on this court's decision in *State* v. *Baccala*, 326 Conn. 232, 163 A.3d 1, cert. denied, U.S. , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017),[6] the Appellate Court, in a two-to-one decision, agreed with the defendant that the evidence was insufficient to support his conviction because his utterances were unlikely to provoke an immediate, violent

ously with the offensive utterances. Rather, we read the decision's reference to that conduct as consistent with the record; see, e.g., *Lauer* v. *Zoning Commission*, 220 Conn. 455, 470, 600 A.2d 310 (1991) (reviewing court reads arguably ambiguous trial court record to support, rather than to undermine, its judgment); that is, as reflecting a finding by the trial court only that the conduct was relevant to the broader context in which the defendant's epithets were uttered, which it certainly was. In any event, we, like the Appellate Court, resolve the issue on appeal predicated on the testimony adduced at trial, which is not disputed for purposes of this appeal.

[6] As we discuss more fully hereinafter, in *Baccala*, we concluded that the conviction of the defendant in that case—also for breach of the peace in the second degree in violation of § 53a-181 (a) (5)—had to be reversed, despite the vile and personally demeaning nature of the gender based epithets on which that conviction was predicated, in light of our determination that the defendant's speech was entitled to first amendment protection because it was not likely to evoke a violent response from a reasonable person under the circumstances presented. See *State* v. *Baccala*, supra, 326 Conn. 251–56.

State *v.* Liebenguth

response by a reasonable person in McCargo's shoes—
that is, his utterances were not prohibited fighting
words, and, therefore, the defendant's conviction could
not pass muster under the first amendment. See *State*
v. *Liebenguth*, supra, 181 Conn. App. 53–54.

In support of its conclusion, the Appellate Court rea-
soned: "[T]he defendant used extremely vulgar and offen-
sive language, meant to personally demean McCargo.
Under the circumstances in which he uttered this lan-
guage, however, it was not likely to tend to provoke
a reasonable person in McCargo's position immedi-
ately to retaliate with violence. Although the evidence
unequivocally supports a finding that the defendant at
one point walked toward McCargo while yelling and
moving his hands . . . [t]he evidence [also] unequivo-
cally shows . . . that the defendant was in his car both
times that he directed the racial slurs toward McCargo.
McCargo did testify that the defendant's use of the slurs
shocked and appalled him, and that he found the remarks
offensive. He also testified, however, that he remained
calm throughout the encounter and felt no need to raise
his voice to the defendant. A reasonable person acting
in the capacity of a parking official would be aware that
some level of frustration might be expressed by some
members of the public who are unhappy with receiv-
ing tickets and would therefore not be likely to retaliate
with immediate violence during such an interaction. In
reviewing the entire context of the interaction, we there-
fore find that, because McCargo was unlikely to retali-
ate with immediate violence to the conduct for which
the defendant was charged, the defendant's words were
not 'fighting words,' [on] which he might appropriately
be convicted of breach of the peace. The defendant's
conviction of breach of the peace in the second degree
must therefore be reversed." (Footnotes omitted.) Id.

Judge Devlin dissented with respect to this holding
because, in his view, the defendant's remarks, when con-

State *v.* Liebenguth

sidered in the context in which they were uttered, constituted fighting words that were likely to provoke a reasonable person in McCargo's position to retaliate with violence. See id., 66 (*Devlin, J.*, concurring in part and dissenting in part). Judge Devlin concluded that the majority did not adequately account for the truly heinous and inflammatory nature of the word "nigger," in particular, when, as in the present case, that "viciously hostile epithet," which has deep roots in this nation's long and deplorable history of racial bigotry and discrimination, is used by a white person with the intent of demeaning and humiliating an African-American person. (Internal quotation marks omitted.) Id., 64–65 (*Devlin, J.*, concurring in part and dissenting in part). In rejecting the defendant's assertion that his speech was shielded from prosecution by the first amendment, Judge Devlin explained that the defendant's words "were scathing insults that in many situations would provoke a reflexive, visceral response." Id., 67 (*Devlin, J.*, concurring in part and dissenting in part). Indeed, according to Judge Devlin, "if angrily calling an African-American man a 'fucking [nigger]' after taunting him with references to a recent police shooting of a young African-American man by a white police officer is not breach of the peace," then the fighting words doctrine no longer has any "continued vitality" under the first amendment. (Internal quotation marks omitted.) Id., 68 (*Devlin, J.*, concurring in part and dissenting in part).

We subsequently granted the state's petition for certification to appeal to decide whether the Appellate Court was correct in holding that the defendant's conviction had to be reversed because the language that formed the basis of that conviction was protected by the first amendment.[7] For the reasons that follow, we agree with

_____

[7] Specifically, we certified the following issue: "Did the Appellate Court properly conclude that the defendant's conviction for breach of the peace in the second degree had to be reversed in light of the holding in [*Baccala*] . . . ?" (Citation omitted.) *State* v. *Liebenguth*, supra, 330 Conn. 901.

State *v.* Liebenguth

Judge Devlin and the trial court that, under the circumstances presented, the first amendment does not bar the defendant's conviction because his racist and demeaning utterances were likely to incite a violent reaction from a reasonable person in McCargo's posi-tion.[8]

For purposes of this appeal, there is no dispute that the evidence adduced by the state at trial supports the trial court's factual findings. The sole issue we must decide, then, is whether, contrary to the determination of the Appellate Court, those factual findings and any inferences that reasonably may be drawn therefrom are sufficient to establish the defendant's guilt beyond a reasonable doubt. See, e.g., *State* v. *Parnoff*, 329 Conn. 386, 395, 186 A.3d 640 (2018).

Because the defendant's conviction is predicated on his verbal statements, our determination of the sufficiency of the state's case necessarily depends on whether those statements deserve the protection of the first amendment, despite their patently offensive and objectionable nature. If they do, they cannot serve as the basis for his conviction, which would have to be reversed for evidentiary insufficiency. The defendant having been charged with violating § 53a-181 (a) (5) by use of allegedly "abusive . . . language"; General Statutes § 53a-181 (a) (5); see footnote 1 of this opinion; we therefore must decide whether his language, which was no doubt "abusive" under the commonly understood meaning of that term, nonetheless is entitled to constitutional protection. To make that determination,

[8] The defendant makes no claim that, in the event we disagree with the Appellate Court that his speech was protected by the first amendment to the United States constitution, his conviction nevertheless was barred by the free speech provisions of article first, §§ 4 and 5, of the Connecticut constitution. We therefore have no occasion to consider whether the fighting words exception to the protection afforded speech under the first amendment also constitutes an exception to the free speech guarantees of the state constitution and, if so, whether its scope is coextensive with that of the exception recognized under the first amendment.

State *v.* Liebenguth

we apply the judicial gloss necessary to limit the reach of the breach of the peace statute to ensure that it comports with constitutional requirements. See *State* v. *Baccala*, supra, 326 Conn. 234, 251 (placing gloss on § 53a-181 (a) (5) to avoid possibility of conviction founded on constitutionally protected speech). For present purposes, "the constitutional guarantee of freedom of speech requires that [§ 53a-181 (a) (5)] be confined to language [that], under the circumstances of its utterance, constitutes [unprotected] fighting words—those [that] by their very utterance inflict injury or tend to incite an immediate breach of the peace." (Internal quotation marks omitted.) *State* v. *Beckenbach*, 1 Conn. App. 669, 678, 476 A.2d 591 (1984), rev'd on other grounds, 198 Conn. 43, 501 A.2d 752 (1985). "Accordingly, to establish the defendant's violation of § 53a-181 (a) (5) . . . in light of its constitutional gloss, the state was required to prove beyond a reasonable doubt that the defendant's words were likely to provoke an imminent violent response" under the circumstances in which they were uttered. (Citation omitted.) *State* v. *Baccala*, supra, 250–51.

In view of the fact that the state's case against the defendant implicates his free speech rights, several additional principles govern our review of the issue presented. In certain cases, such as the present one, in which "[the line between speech unconditionally guaranteed and speech that may be legitimately regulated] must be drawn, the rule is that we examine for ourselves the statements [at] issue and the circumstances under which they were made to see if they are consistent with the first amendment." (Internal quotation marks omitted.) Id., 251. In other words, "the inquiry into the protected status of . . . speech is one of law, not fact." (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 329 Conn. 395. We therefore "apply a de novo standard of review . . . ." (Internal quotation marks omitted.) Id. Accordingly, we have "an obligation to

State *v.* Liebenguth

make an independent examination of the whole record
in order to make sure that the judgment does not consti-
tute a forbidden intrusion [in] the field of free expres-
sion.'' (Internal quotation marks omitted.) Id., 395–96.
''This independent scrutiny, however, does not autho-
rize us to make credibility determinations regarding dis-
puted issues of fact. Although we review de novo the trier
of fact's ultimate determination that the statements at
issue constituted [fighting words], we accept all subsid-
iary credibility determinations and findings that are not
clearly erroneous.'' (Internal quotation marks omitted.)
Id., 396.

Recently, in *State* v. *Baccala*, supra, 326 Conn. 237–50,
we undertook a thoroughgoing examination of the roots
and scope of the fighting words doctrine, which was first
articulated by the United States Supreme Court more
than seventy-five years ago in *Chaplinsky* v. *New
Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031
(1942). See id., 569, 573 (holding that ''God damned
racketeer'' and ''damned Fascist'' were epithets likely
to provoke addressee to retaliate violently, thereby
causing breach of the peace (internal quotation marks
omitted)). As we explained in *Baccala*; see *State* v. *Bac-
cala*, supra, 237–38; although the first amendment pro-
tects nearly all speech, no matter how detestable or
odious it may be, that protection does not extend to
the extremely narrow category of words that ''have a
direct tendency to cause acts of violence by the person
to whom, individually, the remark is addressed.'' (Inter-
nal quotation marks omitted.) *Chaplinsky* v. *New
Hampshire*, supra, 573. In recognizing the fighting
words exception to the protection ordinarily afforded
speech under the first amendment, the court in *Chap-
linsky* reasoned that such words comprise ''no essential
part of any exposition of ideas, and are of such slight
social value as a step to truth that any benefit that may
be derived from them is clearly outweighed by the social
interest'' in maintaining the peace by preventing the
immediate incitement of violence. Id., 572.

State *v.* Liebenguth

It is by now well settled that there are no per se fighting words because words that are likely to provoke an immediate, violent response when uttered under one set of circumstances may not be likely to trigger such a response when spoken in the context of a different factual scenario. See *State* v. *Baccala*, supra, 326 Conn. 238. Consequently, whether words are fighting words necessarily will depend on the particular circumstances of their utterance. See id., 239; see also *State* v. *Hoskins*, 35 Conn. Supp. 587, 591, 401 A.2d 619 (App. Sess. 1978) ("The fighting words concept has two aspects. One involves the quality of the words themselves. The other concerns the circumstances under which the words are used." (Internal quotation marks omitted.)). This contextual approach is also "a logical reflection of the way the meaning and impact of words change over time." *State* v. *Baccala*, supra, 239; see also id. ("[w]hile calling someone a racketeer or a fascist might naturally have invoked a violent response in the 1940s when *Chaplinsky* was decided, those same words would be unlikely to even raise an eyebrow today"). Indeed, due to changing social norms, public discourse has become coarser in the years following *Chaplinsky*; id., 298 (*Eveleigh, J.*, concurring in part and dissenting in part); such that, today, "there are fewer combinations of words and circumstances that are likely to fit within the fighting words exception."[9] *State* v. *Parnoff*, supra, 329

_____

[9] In this regard, we observed in *Baccala* that, "[i]n this day and age, the notion that any set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Baccala*, supra, 326 Conn. 239. Although the United States Supreme Court has not upheld a conviction under the fighting words doctrine since *Chaplinsky*; e.g., C. Calvert, "First Amendment Envelope Pushers: Revisiting the Incitement-to-Violence Test with Messrs. Brandenburg, Trump, & Spencer," 51 Conn. L. Rev. 117, 149 (2019); and, despite scholarly criticism of the doctrine; see, e.g., W. Reilly, Note, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 947–49 (2000); Note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1140–46 (1993); the court has never disavowed the doctrine and, from time to time, has referred

State *v.* Liebenguth

Conn. 413 (*Kahn, J.*, concurring in the judgment); see also id. ("[a]s certain language is acceptable in more situations, the borders of the fighting words exception contract").

Against this broad jurisprudential backdrop in *Baccala*, we sought to identify the kinds of considerations likely to be relevant in determining, in any given case, whether the words at issue constituted unprotected fighting words. We explained: "A proper contextual analysis requires consideration of the actual circumstances as perceived by a reasonable speaker and addressee to determine whether there was a likelihood of violent retaliation. . . . This necessarily includes a consideration of a host of factors.

"For example, the manner and circumstances in which the words were spoken . . . [and] [t]he situation under which the words are uttered . . . . Thus, whether the words were preceded by a hostile exchange

to it, albeit in dicta, as one of the few historic exceptions to the first amendment's prohibition against content based restrictions on speech. See, e.g., *Brown* v. *Entertainment Merchants Assn.*, 564 U.S. 786, 791, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011) ("From 1791 to the present . . . the [f]irst [a]mendment has permitted restrictions [on] the content of speech in a few limited areas, and has never include[d] a freedom to disregard these traditional limitations. . . . These limited areas . . . such as . . . fighting words . . . represent well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem . . . ." (Citations omitted; internal quotation marks omitted.)); *Virginia* v. *Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) ("[A] [s]tate may punish those words [that] by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . . [C]onsequently . . . fighting words—those personally abusive epithets [that], when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke a violent reaction—are generally proscribable under the [f]irst [a]mendment." (Citations omitted; internal quotation marks omitted.)). In any event, the defendant makes no claim that the fighting words doctrine is a dead letter for federal constitutional purposes; he claims, rather, that the words he used were not fighting words and, consequently, that his conviction based on those words is prohibited by the first amendment. In addition, as we previously noted; see footnote 8 of this opinion; the defendant does not raise a claim under the state constitution.

State *v.* Liebenguth

or accompanied by aggressive behavior will bear on
the likelihood of such a reaction. . . .

"A proper examination of context also considers those
personal attributes of the speaker and the addressee
that are reasonably apparent because they are necessarily a part of the objective situation in which the speech
was made. . . . Courts have, for example, considered
the age, gender, race, and status of the speaker. . . .
Indeed, common sense would seem to suggest that
social conventions, as well as special legal protections,
could temper the likelihood of a violent response when
the words are uttered by someone less capable of protecting [himself or herself], such as a child, a frail elderly
person, or a seriously disabled person.

"Although . . . the speech must be of such a nature
that it is likely to provoke the *average* person to retaliation . . . when there are objectively apparent characteristics that would bear on the likelihood of such a
response, many courts have considered the average person with those characteristics. Thus, courts also have
taken into account the addressee's age, gender, and
race. . . .

"Similarly, because the fighting words exception is
concerned with the likelihood of violent retaliation, it
properly distinguishes between the average citizen and
those addressees who are in a position that carries
with it an expectation of exercising a greater degree of
restraint. . . . [Consequently, because] a properly
trained [police] officer may reasonably be expected to
exercise a higher degree of restraint than the average
citizen . . . [we] hold police officers to a higher standard than ordinary citizens when determining the likelihood of a violent response by the addressee." (Citations
omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *State* v. *Baccala*, supra,
326 Conn. 240–44.

State *v.* Liebenguth

In addition, "several courts have considered as part of the contextual inquiry whether the addressee's position would reasonably be expected to cause him or her to exercise a higher degree of restraint than the ordinary citizen under the circumstances." Id., 245. "Finally . . . the fighting words exception is not concerned with creating symmetrical free speech rights by way of establishing a uniform set of words that are constitutionally proscribed. . . . Rather, because the fighting words exception is intended only to prevent the likelihood of an actual violent response, it is an unfortunate but necessary consequence that we are required to differentiate between addressees who are more or less likely to respond violently and speakers who are more or less likely to elicit such a response." (Citation omitted.) Id., 249.

We then summarized: "Accordingly, a proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there is a likelihood of violent retaliation. This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely." Id., 250. The starting point, however, for any analysis of a claim involving the fighting words doctrine must include an examination of the words themselves and the extent to which they are understood to be inflammatory or inciting.

With respect to the language at issue in the present case, the defendant, who is white, uttered the words "fucking niggers" to McCargo, an African-American person, thereby asserting his own perceived racial dominance and superiority over McCargo with the obvious intent of denigrating and stigmatizing him. When used in that way, "[i]t is beyond question that the use of the word 'nigger' is highly offensive and demeaning,

State *v.* Liebenguth

evoking a history of racial violence, brutality, and subordination.'' *McGinest* v. *GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004). Not only is the word "nigger" undoubtedly the most hateful and inflammatory racial slur in the contemporary American lexicon; see id.; but it is probably the single most offensive word in the English language. See, e.g., *Ayissi-Etoh* v. *Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[The] epithet ['nigger'] has been labeled, variously, a term that 'sums up . . . all the bitter years of insult and struggle in America,' [L. Hughes, The Big Sea: An Autobiography (Hill and Wang 2d Ed. 1993) p. 269], 'pure anathema to African-Americans,' *Spriggs* v. *Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), and 'probably the most offensive word in English.' [Random House Webster's College Dictionary (2d Rev. Ed. 2000) p. 894]. See generally [A. Haley, Roots: The Saga of an American Family (Doubleday 1976); [H. Lee, To Kill a Mockingbird (J. B. Lippincott Co. 1960)]. . . . No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans.'' (Citation omitted.)); R. Kennedy, "The David C. Baum Lecture: 'Nigger!' as a Problem in the Law," 2001 U. Ill. L. Rev. 935, 935 (although "[t]he American language is (and has long been) rife with terms of ethnic, racial, and national insult: kike, mick, wop, nip, gook, honkie, wetback, chink, [etc.] . . . 'nigger is now probably the most offensive word in English' " (footnote omitted)); Dictionary.com, available at https://www.dictionary.com/browse/nigger?s=t ("The term nigger is now probably the most offensive word in English. Its degree of offensiveness has increased markedly in recent years, although it has been used in a derogatory manner since at least the Revolutionary War.").

In fact, because of the racial prejudice and oppression with which it is forever inextricably linked, the word

State *v.* Liebenguth

"nigger," when used by a white person as an assertion of the racial inferiority of an African-American person, "is more than [a] mere offensive utterance . . . . No word . . . is as odious or loaded with as terrible a history." (Internal quotation marks omitted.) *Daso* v. *Grafton School, Inc.*, 181 F. Supp. 2d 485, 493 (D. Md. 2002); see also *In re John M.*, 201 Ariz. 424, 428, 36 P.3d 772 (App. 2001) ("the term is generally regarded as virtually taboo because of the legacy of racial hatred that underlies the history of its use among whites" (internal quotation marks omitted)); *In re Spivey*, 345 N.C. 404, 414, 480 S.E.2d 693 (1997) ("[N]o fact is more generally known than that a white man who calls a black man a 'nigger' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate. The trial court was free to judicially note this fact."). The word being "one of insult, abuse and belittlement harking back to slavery days"; (internal quotation marks omitted) *Taylor* v. *Metzger*, 152 N.J. 490, 510, 706 A.2d 685 (1998); it is uniquely "expressive of racial hatred and bigotry"; (internal quotation marks omitted) *Swinton* v. *Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001), cert. denied, 535 U.S. 1018, 122 S. Ct. 1609, 152 L. Ed. 2d 623 (2002); and "degrading and humiliating in the extreme . . . ." (Citation omitted; internal quotation marks omitted.) *Pryor* v. *United Air Lines, Inc.*, 791 F.3d 488, 496 (4th Cir. 2015). For all these reasons, the word rightly has been characterized as "the most provocative, emotionally-charged and explosive term in the [English] language." (Internal quotation marks omitted.) *Lee* v. *Superior Court*, 9 Cal. App. 4th 510, 513, 11 Cal. Rptr. 2d 763 (1992).

In addition to the defendant's use of the word "niggers," other language and conduct by the defendant further inflamed the situation, rendering it that much more likely to provoke a violent reaction. First, the defendant used the profane adjective "fucking"— a word of emphasis meaning wretched, rotten or

State *v.* Liebenguth

accursed[10]—to intensify the already highly offensive and demeaning character of the word "niggers." Like the term "nigger," however, the term " 'fucking nigger' [is] . . . so powerfully offensive that . . . [it] inflicts cruel injury by its very utterance. It is degrading, it is humiliating, and it is freighted with a long and shameful history of humiliation, the ugly effects of which continue to haunt us all." *Augis Corp.* v. *Massachusetts Commission Against Discrimination*, 75 Mass. App. 398, 409, 914 N.E.2d 916, appeal denied, 455 Mass. 1105, 918 N.E.2d 90 (2009). The defendant's resort to such language underscored for McCargo how especially incensed and insulted the defendant was by virtue of his having been issued the ticket by an African-American parking official. By adding this additional measure of contempt and disgust to the epithet, the defendant only amplified the assaultive nature of the utterance, making it even more hateful and debasing.

Second, the defendant, having directed the term "fucking niggers" at McCargo upon entering his vehicle and learning that McCargo had ticketed him, was not content just to leave and end the confrontation. Instead, after McCargo had entered his vehicle and was starting to drive out of the parking lot, the defendant circled the lot twice, pulled up next to McCargo and, while looking angrily at him, again uttered the term "fucking niggers," this time more loudly than before. The fact that the defendant repeated this epithet only served to exacerbate the provocative and hostile nature of the confrontation. See *Landrum* v. *Sarratt*, 352 S.C. 139, 145, 572 S.E.2d 476 (App. 2002) (whether epithets were uttered repeatedly is factor to be considered in fighting words determination); see also *State* v. *Szymkiewicz*, 237 Conn. 613, 615–16, 623, 678 A.2d 473 (1996) (holding that certain epithets were fighting words due, in part, to repeated nature of utterances).

---

[10] New Dictionary of American Slang (R. Chapman ed., 1986) p. 151.

State *v.* Liebenguth

Third, the defendant employed additional, racially offensive, crude and foreboding language during his interaction with McCargo. Early on in the defendant's confrontation with McCargo, after learning that he had been issued a ticket, the defendant became angry and loudly asserted that the parking authority, McCargo's employer, was "fucking unbelievable.'' Almost immediately thereafter, the defendant injected race into the encounter, first stating that McCargo had ticketed him because his car is white and then accusing McCargo of issuing him the ticket because the defendant himself is white. Next, as the defendant walked to his vehicle, he uttered the words, "remember Ferguson.'' In light of the defendant's other racially charged remarks, his menacing invocation of the extremely controversial shooting of a young, unarmed African-American man by a white police officer had its intended effect: McCargo understood that the defendant was raising the specter of the same race based violence that reportedly had occurred in Ferguson, Missouri. Considering the defendant's offensive remarks together, as we must; see, e.g., *State* v. *Parnoff*, supra, 329 Conn. 401 n.5 (fighting words determination requires consideration of "the totality of the attendant circumstances''); the defendant's reference to Ferguson significantly escalated the already fraught and incendiary confrontation.

Finally, in addition to his offensive and intimidating utterances, certain conduct by the defendant further manifested his extreme anger and hostility toward McCargo. As the two men were speaking outside of their respective vehicles, the defendant stepped toward McCargo while moving his hands and body in an aggressive and irate manner. Frangione witnessed the defendant's conduct and testified that, even from about seventy feet away, the hostility of the encounter made her nervous and upset. Moreover, after entering his car, the defendant drove through the parking lot twice before

State *v.* Liebenguth

leaving, cutting through empty parking spaces so he could pass by McCargo and again angrily confront him. As we observed in *Baccala*, the fact that the defendant's words were accompanied by such aggressive and menacing behavior increased the likelihood of a violent response. See *State* v. *Baccala*, supra, 326 Conn. 241.

As we previously discussed, speech will be deemed to be unprotected fighting words only if it so "touch[es] the raw nerves of [the addressee's] sense of dignity, decency, and personality . . . [that it is likely] to trigger an immediate violent reaction"; (internal quotation marks omitted) *State* v. *Beckenbach*, supra, 1 Conn. App. 678; a standard that, we have said, is satisfied only if the speech is so inflammatory that it "is akin to dropping a match into a pool of gasoline." (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 329 Conn. 394. We believe this to be the rare case in which that demanding standard has been met. Born of violence, the word "nigger," when uttered with the intent to personally offend and demean, also engenders violence. Indeed, such use of the word "nigger" aptly has been called "a classic case" of speech likely to incite a violent response. *In re Spivey*, supra, 345 N.C. 415; see also *State* v. *Hoshijo ex rel. White*, 102 Haw. 307, 322, 76 P.3d 550 (2003) ("The experience of being called 'nigger' . . . is like receiving a slap in the face. The injury is instantaneous." (Internal quotation marks omitted.)). It therefore is unsurprising that many courts have rejected first amendment challenges to convictions predicated on the use of the word. See, e.g., *In re John M.*, supra, 201 Ariz. 428 ("lean[ing] out of a car window and scream[ing] at an African-American woman, 'fuck you, you god damn nigger,' before the car pulled into a nearby . . . parking lot" was behavior likely to provoke an immediate violent response); *State* v. *Hoshijo ex rel. White*, supra, 321 (speech of student manager of university basketball team who yelled "shut up you [fucking] nigger," "I'm tired of hearing your shit," and

State *v.* Liebenguth

[s]hut your mouth or I'll kick your ass'' to African-
American spectator constituted unprotected fighting
words); *In re J.K.P.*, Docket No. 108,617, 2013 WL
1010694, *1, *3–5 (Kan. App. March 8, 2013) (calling boys
in group of African-American children "niggers" during
altercation with them constituted fighting words that
violated disorderly conduct statute) (decision with-
out published opinion, 296 P.3d 1140 (2013)); *In re
Shane EE.*, 48 App. Div. 3d 946, 946–47, 851 N.Y.S.2d 711
(2008) (threats and racial slurs, including " 'we shoot
niggers like you in the woods,' " were likely to provoke
immediate violent reaction and therefore constituted
fighting words); *In re Spivey*, supra, 408, 414 ("loudly
and repeatedly address[ing] a black patron [at a bar]
. . . using the derogatory and abusive racial epithet
'nigger' " was conduct that "squarely falls within the
category of unprotected [fighting words]"); *In re H.K.*,
778 N.W.2d 764, 766–67, 770 (N.D. 2010) (following Afri-
can-American girl into bathroom during dance, calling
her "nigger" and threatening her constituted fighting
words likely to incite breach of peace); see also *Bailey*
v. *State*, 334 Ark. 43, 53–54, 972 S.W.2d 239 (1998) (stat-
ing that word "nigger" was fighting word in context
used); *Lee* v. *Superior Court*, supra, 9 Cal. App. 4th 518
(upholding trial court's denial of request by African-
American to change his name from Russell Lawrence
Lee to "Misteri Nigger" and stating that "men and
women . . . of common intelligence would under-
stand [that] . . . [the word nigger] likely [would] cause
an average addressee to fight" (internal quotation marks
omitted)). To whatever extent public discourse in gen-
eral may have coarsened over time; see, e.g., *State* v.
*Baccala*, supra, 326 Conn. 239; it has not eroded to the
point that the racial epithets used in the present case
are any less likely to provoke a violent reaction today
than they were in previous decades.

In support of his contention that the Appellate Court
correctly concluded that his language did not constitute

State *v.* Liebenguth

fighting words, the defendant argues that "a public official [such as McCargo] is expected to exercise a greater degree of self-restraint in the face of provocation than is a civilian." To support this assertion, however, the defendant cites to cases involving offensive language directed at police officers,[11] in particular, *Resek* v. *Huntington Beach*, 41 Fed. Appx. 57 (9th Cir. 2002), in which the court, in concluding that the words " '[t]hat's fucked up, those pigs can't do that' " were not fighting words; id., 59; went on to explain that, "[a]long with good judgment, intelligence, alertness, and courage, the job of police officers requires a thick skin. Theirs is not a job for people whose feelings are easily hurt." Id. Although we agree that police officers generally are expected to exercise greater restraint than the average citizen when confronted with offensive language or unruly conduct, McCargo was not a police officer, and his duties cannot fairly be characterized as similar to those of a police officer. Additionally, McCargo's testimony concerning his five years of experience as a parking enforcement officer—testimony in which he explained that he never before had been on the receiving end of such hostile or offensive language or had ever reported a prior incident to the police—suggests that the abuse McCargo endured during his encounter with the defendant well exceeded that which someone in his position reasonably might be expected to face. Consequently, although we do agree with the Appellate Court that McCargo, like any parking enforcement official, undoubtedly was

---

[11] The defendant relies on the following cases in which the court determined that certain words directed at a police officer were not fighting words: *Kennedy* v. *Villa Hills*, 635 F.3d 210, 215–16 (6th Cir. 2011) (calling police officer " 'son of a bitch' " and "a 'fat slob' "); *Johnson* v. *Campbell*, 332 F.3d 199, 203, 215 (3d Cir. 2003) (calling police officer who was conducting stop " 'son of a bitch' "); *Duran* v. *Douglas*, 904 F.2d 1372, 1377 (9th Cir. 1990) (shouting profanities and making obscene gestures at police officer); *Barboza* v. *D'Agata*, 151 F. Supp. 3d 363, 367, 371–72 (S.D.N.Y. 2015) ("[f]uck your shitty town bitches" written on payment form accompanying speeding ticket); *State* v. *Nelson*, 38 Conn. Supp. 349, 351 n.1, 355, 448 A.2d 214 (App. Sess. 1982) (calling police officer " 'fucking asshole, a fucking pig' ").

State *v.* Liebenguth

aware that some members of the public might well express frustration and even anger upon receiving a ticket;[12] see, e.g., *State* v. *Liebenguth*, supra, 181 Conn. App. 54; we disagree that the average African-American parking official would have been prepared for and responded peaceably to the kind of racial slurs, threatening innuendo, and aggressive behavior with which McCargo was confronted.

It is true, of course, that McCargo did not react violently despite the highly inflammatory and inciting nature of the defendant's language and conduct. "[Even] [t]hough the fighting words standard is an objective inquiry . . . examining the subjective reaction of an addressee, although not dispositive, may be probative of the likelihood of a violent reaction." (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 329 Conn. 403. Although McCargo acknowledged that the defendant's racial epithets had shocked and appalled him and that he felt "very bad" and personally insulted by them, he quite rightly opined that he had "handled [him]self very well" under the circumstances. We fully agree, of course, that McCargo handled the incident exceptionally well, but we simply are not persuaded that the average person would have exercised a similar measure of self-control and professionalism under the same circumstances. Thus, the fact that McCargo did not react violently in the face of the defendant's malicious and demeaning insults does not alter our conclusion with respect to the likelihood of a violent reaction to that language. See, e.g., *State* v. *Hoshijo ex rel. White*, supra, 102 Haw. 322 ("[It] is of no consequence . . . [that violence was not precipitated], as the proper standard is whether the words were *likely to provoke a violent response*, not whether violence occurred. Plainly, there is no requirement that violence must occur, merely that

---

[12] We note, however, that there is nothing in the record to indicate that McCargo received any special training on how to deal with persons who become unusually irate or insulting upon being issued a parking ticket.

State *v.* Liebenguth

there be a likelihood of violence. It is abundantly clear
on the facts of this case that there was a likelihood
of violence.'' (Emphasis in original.)); *Little Falls* v.
*Witucki*, 295 N.W.2d 243, 246 (Minn. 1980) (''The fact
that the addressee and object of the fighting words
exercised responsible and mature forbearance in not
retaliating cannot be relied [on] by [the] defendant to
escape responsibility for his own actions. . . . The
focus is properly on the nature of the words and the
circumstances in which they were spoken rather than
on the actual response. The actual response of the
addressee and object of the words is relevant, but not
determinative, of the issue of whether the utterances
meet the fighting words test.'').

We also reject the defendant's contention that his
use of the epithets ''fucking niggers'' cannot provide
the basis of his conviction in view of the fact that the
defendant and McCargo were in their vehicles on both
occasions when the defendant directed those slurs at
McCargo. Because the rationale underlying the fighting
words doctrine is the state's interest in preventing the
immediate violent reaction likely to result when highly
offensive language is used to insult and humiliate the
addressee, ''[t]he potential to elicit [such] an immediate
violent response exists only [when] the communication
occurs [face to face] or in close physical proximity.''
*Billings* v. *Nelson*, 374 Mont. 444, 449, 322 P.2d 1039
(2014). This requirement is satisfied in the present case
even though both men were in their vehicles when the
defendant uttered the slurs. When the defendant did so
for the first time, McCargo had pulled his vehicle so
close to the defendant's vehicle that the defendant
accused McCargo of intentionally blocking him in. On
the second such occasion, the defendant turned directly
toward McCargo as he drove by McCargo's vehicle and
then repeated the slur loud enough so that McCargo
would be sure to hear it. At this point, the men were
sufficiently close that McCargo could see the angry

State *v.* Liebenguth

expression on the defendant's face and discern that he
had uttered the slur louder the second time than he
had the first time. At all relevant times, therefore, the
two men were in close proximity to and maintained
eye contact with one another, so that each could see
and hear the other clearly and without difficulty. In
such circumstances, it would have been easy enough for
McCargo to exit his vehicle and to charge after the defen-
dant, or to ram the defendant's vehicle with his own, or
to pursue the defendant out of the parking lot in his own
vehicle. Unless the use of a vehicle by the speaker makes
it impossible for the addressee to retaliate immediately,
courts routinely have held that the likelihood of an imme-
diate violent reaction is not diminished merely because
the speaker or addressee was in a vehicle when the
offending utterances were made. See, e.g., *In re John
M.*, supra, 201 Ariz. 428–29 (passenger in car who yelled
'' 'fuck you, you god damn nigger' '' before car pulled into
parking lot was found to have used fighting words likely
to provoke violent reaction); *Billings* v. *Nelson*, supra,
450 ("The fact that [the defendant and the driver] were
in a car does not mean their speech could not have incited
an immediate violent response from a listener on the
street. . . . [The victim] was close enough to recognize
the [speakers'] faces and to hear their words clearly,
even though they did not holler them." (Citation omit-
ted; internal quotation marks omitted.)); *In re S.J.N-K.*,
 647 N.W.2d 707, 709, 711–12 (S.D. 2002) (when passen-
ger in vehicle who repeatedly uttered '' 'fuck you' '' with
accompanying middle finger gesture while driver of
vehicle cut diagonally across adjacent parking lot and
in front of addressee's vehicle, evidence established
that passenger's words and gestures constituted unpro-
tected fighting words). But cf. *Sandul* v. *Larion*, 119
F.3d 1250, 1252, 1255 (6th Cir.) (when passenger in
vehicle traveling at high rate of speed shouted '' '[fuck]
you' '' and extended his middle finger at abortion pro-
testers who were located considerable distance away,

State *v.* Liebenguth

there was no face-to-face contact between passenger and protesters, no protester was offended or even acknowledged passenger's behavior, and entire incident was over in matter of seconds, "it was inconceivable that [the passenger's] fleeting actions and words would provoke the type of lawless action" necessary to satisfy fighting words standard), cert. dismissed, 522 U.S. 979, 118 S. Ct. 439, 139 L. Ed. 2d 377 (1997).

Finally, the defendant claims that the Appellate Court correctly concluded that the present case is governed by our analysis and conclusion in *State* v. *Baccala*, supra, 326 Conn. 232, in which we determined that the vulgar language at issue in that case did not constitute fighting words. We reject this argument because *Baccala* is distinguishable from the present case in a number of material respects.[13]

Before doing so, however, it is necessary to recite the relevant facts of *Baccala* and the reasons we reached the conclusion we did. Those facts, as explained in our decision in that case, are as follows. "On the evening of September 30, 2013, the defendant [Nina C. Baccala] telephoned the Stop & Shop supermarket in Vernon to announce that she was coming to pick up a Western Union money transfer so they would not close the customer service desk before she arrived. [Baccala] spoke with Tara Freeman, an experienced assistant store manager who was in charge of the daily operations at the supermarket . . . . Freeman informed [Baccala] that the customer service desk already had closed and that she was unable to access the computer that processed Western Union transactions. [Baccala] became

_____

[13] We note that the defendant further contends that the trial court's requirement that he undergo a cultural diversity course prescribed and approved by his probation officer evidences that the trial court's guilty finding "constitutes a unique and unprecedented attempt to criminalize incivility or racist attitudes." We disagree. The probationary condition falls squarely within the court's considerable sentencing discretion, and, indeed, it is obviously well-founded in light of the defendant's conceded language and conduct.

State *v.* Liebenguth

belligerent, responded that she 'really didn't give a shit,' and called Freeman '[p]retty much every swear word you can think of' before the call was terminated.

"Despite Freeman's statements to the contrary, [Baccala] believed that as long as she arrived at the supermarket before 10 p.m., she should be able to obtain the money transfer before the customer service desk closed. Accordingly, a few minutes after she telephoned, [Baccala] arrived at the supermarket, which was occupied by customers and employees. [She] proceeded toward the customer service desk located in proximity to the registers for grocery checkout and began filling out a money transfer form, even though the lights at the desk were off. Freeman approached [Baccala], a forty year old woman who used a cane due to a medical condition that caused severe swelling in her lower extremities, and asked her if she was the person who had called a few minutes earlier. Although [Baccala] denied that she had called, Freeman recognized her voice. After Freeman informed [Baccala], as she had during the telephone call, that the customer service desk was closed, [Baccala] became angry and asked to speak with a manager. Freeman replied that she was the manager and pointed to her name tag and a photograph on the wall to confirm her status. [Other] employees . . . were standing nearby as this exchange took place.

"[Baccala] proceeded to loudly call Freeman a 'fat ugly bitch' and a 'cunt,' and said 'fuck you, you're not a manager,' all while gesticulating with her cane. Despite [Baccala's] crude and angry expressions . . . Freeman remained professional. She simply responded, '[h]ave a good night,' which prompted [Baccala] to leave the supermarket." Id., 235–36. Following a jury trial, Baccala was convicted of breach of the peace in the second degree in violation of § 53a-181 (a) (5). Id., 233–34, 236. On appeal to this court, we agreed with Baccala that her

State *v.* Liebenguth

conviction was incompatible with the first amendment. See id., 234–35.

We began our analysis of Baccala's claim with the observation that the language she used was both extremely offensive and intentionally demeaning. Id., 251. We nevertheless concluded that her utterances did not rise to the level of fighting words because, under the circumstances, they were not likely to trigger an immediate violent response by the average person in Freeman's position. Id., 254. In reaching this conclusion, we relied primarily on four considerations relative to the circumstances of the encounter. First, the verbal assault that Baccala launched against Freeman on the telephone placed Freeman on notice of the possibility that Baccala would resort to similar language when she arrived at the supermarket a few minutes later. Id., 252. Second, as a person in an "authoritative [position] of management and control," Freeman would be expected to diffuse such a hostile situation by "model[ing] appropriate, responsive behavior, aimed at de-escalating the situation," both for the sake of other customers and store personnel alike. Id., 253. Third, as a store manager, Freeman had a measure of control over the premises insofar as she could demand that Baccala leave if she became abusive, threaten to have Baccala arrested for trespassing if she didn't leave, and follow through on that threat if necessary. Id., 253. Fourth, there was no reason to think that Freeman's professional and restrained response to Baccala's offensive harangue was atypical of the manner in which an average person in Freeman's position would have responded to the same provocation under the same circumstances. See id., 253–54.

In the present case, the first three of the foregoing factors support the conclusion that the defendant's utterances *were*, in fact, fighting words. In contrast to the notice Freeman had received with respect to the likelihood of an angry and offensive, face-to-face out-

State *v.* Liebenguth

burst by Baccala, McCargo had no forewarning of the verbal abuse that the defendant inflicted on him. Unlike Freeman, McCargo was not acting in a supervisory capacity with respect to the safety and well-being of others. Nor did he have any degree of control over the area in which his encounter with the defendant took place.

Only the fourth factor we considered in *Baccala*—the fact that Freeman did not resort to violence in responding to the verbal provocation she confronted—militates against a finding that the average person in the same situation as McCargo, who also refrained from any physical retaliation, likely would have had an immediate violent response to the defendant's verbal attack. In *Baccala*, however, our conclusion that the response of the average supermarket manager in Freeman's situation probably would be no different from Freeman's necessarily was predicated on the existence of the first three factors discussed—*none of which* is present here. Moreover, in *Baccala*, we expressly acknowledged that we might have reached a different conclusion if Baccala had directed the same language at Freeman after Freeman had completed work and left the supermarket. Id., 253. Notably, that situation—in which Freeman would not have been acting in a managerial or supervisory capacity, had no real control over the relevant premises, and was more or less alone with Baccala—is much more like the circumstances McCargo found himself in when he was accosted by the defendant.

Finally, we agree with the observation that "[r]acial insults, relying as they do on the unalterable fact of the victim's race and on the history of slavery and race discrimination in this country, have an even greater potential for harm than other insults." R. Delgado, "Words That Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling," 17 Harv. C.R.-C.L. L. Rev.

State *v.* Liebenguth

133, 143 (1982); see id., 135–36 (explaining that such insult "injures the dignity and self-regard of the person to whom it is addressed, communicating the message that distinctions of race are distinctions of merit, dignity, status, and personhood"); see also *Matusick* v. *Erie County Water Authority*, 757 F.3d 31, 38 n.3 (2d Cir. 2014) (observing that word "nigger" has "unique . . . power to offend, insult, and belittle"); *Toussaint* v. *Brigham & Women's Hospital, Inc.*, 166 F. Supp. 3d 110, 116 n.4 (D. Mass. 2015) ("[t]he word 'nigger' has unique meaning that makes its use particularly egregious"). In light of the uniquely injurious and provocative nature of the term, we also agree that its use is all the more likely to engender the kind of violent reaction that distinguishes fighting words from the vast majority of words that, though also offensive and provocative, are nevertheless constitutionally protected.

For all the foregoing reasons, we conclude that the language the defendant used to demean, intimidate and anger McCargo were fighting words likely to provoke a violent response from a reasonable person under the circumstances. Because the first amendment does not shield such speech from prosecution, the state was free to use it to obtain the defendant's conviction of breach of the peace in the second degree, which, as we have explained, is supported by the evidence. Because the Appellate Court reached a contrary conclusion, that portion of its judgment reversing the defendant's conviction on that charge cannot stand.

The judgment of the Appellate Court is reversed with respect to the defendant's conviction of breach of the peace in the second degree only and the case is remanded to that court with direction to affirm the judgment of conviction on that charge; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

State *v.* Liebenguth

KAHN, J., concurring. I agree with and join the majority's opinion, reversing the judgment of the Appellate Court with respect to the conviction of the defendant, David G. Liebenguth, of breach of the peace in the second degree and remanding the case with direction to affirm the trial court's judgment of conviction on that charge. I write separately, however, to reiterate my opinion that "[t]he continuing vitality of the fighting words exception is dubious and the successful invocation of that exception is so rare that it is practically extinct." *State* v. *Parnoff*, 329 Conn. 386, 411, 186 A.3d 640 (2018) (*Kahn, J.*, concurring in the judgment). Despite the diminished scope of the fighting words doctrine, "I assume that the . . . exception remains valid for now, but [remain] . . . mindful that the exception is narrowly construed . . . ." Id., 414. To the extent that the doctrine is viable, I agree with the majority, as well as Justice Ecker's concurring opinion and Judge Devlin's well reasoned view, that when the " 'viciously hostile epithet,' which has deep roots in this nation's long and deplorable history of racial bigotry and discrimination,'' is used to demean and humiliate a person,[1] it constitutes fighting words. See *State* v. *Liebenguth*, 181 Conn. App. 37, 64–65, 186 A.3d 39 (2018) (*Devlin, J.*, concurring in part and dissenting in part). I also note, in particular, that I disagree with the holding and reasoning of *State* v. *Baccala*, 326 Conn. 232, 241–42 and n.7, 163 A.3d 1, cert. denied, U.S. , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017), to the extent that the case stands for the proposition that personal attributes of the addressee such as age, gender, race, and status should be consid-

---

[1] I completely agree with the majority that the racial epithet is particularly demeaning and hostile when used toward an African-American person, thereby likely to provoke a violent reaction. I would not, however, preclude a situation in which the same language directed at a non-African American could result in a similar reaction. By way of example, if the same racial slurs were directed with the same intent to an African-American child in the presence of her or his non-African-American parent, that parent may have a similar visceral reaction of violence.

State *v.* Liebenguth

ered when determining whether a reasonable person
with those characteristics was likely to respond with
violence. Regardless of my ongoing reservations, the
majority has correctly applied precedent from the
United States Supreme Court and this court to which
we remain beholden.

It is axiomatic that the right to free speech is a bed-
rock principle of the United States, one so essential that
the formation of our nation was predicated on its inclu-
sion in the first amendment of the United States con-
stitution. See U.S. Const., amend. I. The right to free
speech, however, is not absolute, and the United States
Supreme Court has delineated the circumstances under
which words fall outside the protections of the first
amendment. One such circumstance is speech that con-
stitutes fighting words. The United States Supreme
Court first articulated the doctrine in the seminal case
of *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 572,
62 S. Ct. 766, 86 L. Ed. 1031 (1942). In that case, the
court carved out an exception to protections afforded
free speech for words "which by their very utterance
inflict injury or tend to incite [violence] . . . ." Id.; see
also *Cohen* v. *California,* 403 U.S. 15, 20, 91 S. Ct. 1780,
29 L. Ed. 2d 284 (1971); *State* v. *Baccala,* supra, 326
Conn. 237. In the more than seventy-five years since
*Chaplinsky* was decided, both the United States Supreme
Court and the dictates of changing societal norms have
diminished the scope and applicability of the fighting
words exception.[2] See Note, "The Demise of the *Chap-*

_____

[2] Even if the fighting words doctrine were obsolete, the defendant's con-
duct could have constituted a violation under other provisions of our criminal
statutes, such as General Statutes § 53a-181 (a) (1). In this case, the state
charged the defendant with breach of the peace under § 53a-181 (a) (5), the
provision that proscribes speech. The defendant, however, engaged in both
speech and conduct that could have supported a charge under § 53a-181
(a) (1), which provides that "[a] person is guilty of breach of the peace in
the second degree when, with intent to cause inconvenience, annoyance or
alarm, or recklessly creating a risk thereof, such person: (1) Engages in
fighting or in violent, tumultuous or threatening behavior in a public place
. . . ." Alternatively, the state could also have charged the defendant with

State *v.* Liebenguth

*linsky* Fighting Words Doctrine: An Argument for Its Interment,'' 106 Harv. L. Rev. 1129, 1129 (1993).

The United States Supreme Court has narrowed the application of the fighting words doctrine, including limiting it to ''those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction''; *Cohen* v. *California*, supra, 403 U.S. 20; thereby ''seemingly abandon[ing] the suggestion in *Chaplinsky* that there are words that by their very utterance inflict injury . . . .'' (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 329 Conn. 411–12 (*Kahn, J.*, concurring in the judgment); see also Note, supra, 106 Harv. L. Rev. 1129. Contemporaneous with judicial constriction of the fighting words exception, societal norms have also evolved, rendering ''public discourse . . . more coarse . . . [and resulting in] fewer combinations of words and circumstances that are likely to fit within the fighting words exception. Indeed, given some of the examples of egregious language that have not amounted to fighting words following *Chaplinsky*, it is difficult to imagine examples that rise to the requisite level today.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Parnoff*, supra, 413 (*Kahn, J.*, concurring in the judgment); see also *State* v. *Baccala*, supra, 326 Conn. 239 (calling someone racketeer or fascist, deemed fighting words in *Chaplinsky*, ''would be unlikely to even raise an eyebrow today'');

disorderly conduct under General Statutes § 53a-182 (a) (1) or (2). Although ''the correct application of the exception to first amendment protection is not based on the charge or charges leveled against the defendant but, rather, on the state's theory of the case,'' by focusing on speech only, the state relied on the fighting words, rather than the true threat, exception to first amendment protection. *State* v. *Parnoff*, supra, 329 Conn. 407 (*Kahn, J.*, concurring in the judgment). The point remains that it is the state that determines on which charge and on which exception to first amendment protection it chooses to rely. The state should consider the wisdom of continuing to pursue a doctrine that has been often criticized and rarely upheld.

State *v.* Liebenguth

*State* v. *Tracy*, 200 Vt. 216, 237, 130 A.3d 196 (2015)
(‘‘in this day and age, the notion that *any* set of words
are so provocative that they can reasonably be expected
to lead an average listener to immediately respond with
physical violence is highly problematic’’ (emphasis in
original)).

This judicial constriction, overlaid with current soci-
etal norms, calls into question the continued vitality of
the fighting words exception. See Note, supra, 106 Harv.
L. Rev. 1146. Regardless, ‘‘against this small and tor-
tured canvas, the fighting words exception resurfaces
occasionally,’’ and the United States Supreme Court
‘‘continues to list fighting words among the exceptions
to first amendment protection. . . . Therefore, I
assume that the fighting words exception remains valid
for now, but [remain] . . . mindful that the exception
is narrowly construed and poses a significant hurdle
for the state to overcome.’’ (Citation omitted.) *State* v.
*Parnoff*, supra, 329 Conn. 413–14 (*Kahn, J.*, concurring
in the judgment).

When determining whether the fighting words excep-
tion applies in a given case, the court must consider
both ‘‘the words used by the defendant’’ and ‘‘the cir-
cumstances in which they were used . . . .’’ *State* v.
*Szymkiewicz*, 237 Conn. 613, 620, 678 A.2d 473 (1996).
This court recently stated that ‘‘[a] proper examination
of context also considers those personal attributes of
the speaker and the addressee that are reasonably appar-
ent because they are necessarily a part of the objective
situation in which the speech was made.’’ *State* v. *Bac-
cala*, supra, 326 Conn. 241. ‘‘[W]hen there are objectively
apparent characteristics that would bear on the likeli-
hood of [a violent] response, many courts have consid-
ered the average person with those characteristics.
Thus, courts also have taken into account the address-
ee’s age, gender, and race.’’ Id., 243. The majority in the
present case agrees that, ‘‘because the fighting words
exception is intended only to prevent the likelihood of

State *v.* Liebenguth

an actual violent response, it is an unfortunate but necessary consequence that we are required to differentiate between addressees who are more or less likely to respond violently and speakers who are more or less likely to elicit such a response.'' (Internal quotation marks omitted.), quoting *State* v. *Baccala*, supra, 249. I disagree with this proposition to the extent that it allows for consideration of the addressee's characteristics beyond ''whether the addressee's position would reasonably be expected to cause him or her to exercise a higher degree of restraint than the ordinary citizen under the circumstances'' when determining whether he or she would respond violently.[3] *State* v. *Baccala*, supra, 245.

The ultimate inquiry of the fighting words exception is whether a speaker's words would reasonably result in a violent reaction by its intended recipient. See, e.g., *Cohen* v. *California*, supra, 403 U.S. 20. Considering the stereotypes associated with immutable characteristics of the addressee, however, produces discriminatory results ''because its application depends on assump-

---

[3] I observe that the United States Supreme Court has suggested that whether the addressee is a police officer should be considered because ''a properly trained officer *may* reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words.'' (Emphasis added; internal quotation marks omitted.) *Houston* v. *Hill*, 482 U.S. 451, 462, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987), quoting *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result); see also *State* v. *Baccala*, supra, 326 Conn. 263–64 (*Eveleigh, J.*, concurring in part and dissenting in part). ''Nevertheless, this court has expressly adopted a narrower application of the fighting words standard for speech addressed to police officer[s],'' at least in some contexts. *State* v. *Baccala*, supra, 264 (*Eveleigh, J.*, concurring in part and dissenting in part); see also *State* v. *DeLoreto*, 265 Conn. 145, 163, 827 A.2d 671 (2003) (''a narrower class of statements constitutes fighting words when spoken to police officers, rather than to ordinary citizens, because of the communicative value of such statements''). To the extent that these cases do not rely on stereotypes related to an addressee's race, gender, age, disability, ethnicity, sexual orientation, or other immutable characteristics, they do not raise the concerns typically associated with the application of the doctrine.

tions about how likely a listener is to respond violently to speech.'' W. Reilly, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 948 (2000). This approach essentially requires courts to promulgate stereotypes on the basis of race, gender, age, disability, ethnicity, and sexual orientation, among others, and has led to much of the scholarly criticism of the fighting words exception. See generally Note, supra, 106 Harv. L. Rev. 1129.

I will refrain from enumerating a laundry list of stereotypes related to violent responses from which flow myriad discriminatory results, but I illustrate one example of a common refrain in society and courts: women are less likely than men to react to offensive situations with physical violence. Id., 1134. Allowing such a stereotype into the analysis of whether a reasonable person in the addressee's circumstances is likely to respond to words with violence creates a situation in which "almost nothing one could say to a woman would be proscribed by the fighting words doctrine . . . ." W. Reilly, supra, 52 Rutgers L. Rev. 948. The overarching result is that groups of people that, for example, are stereotyped as docile due to their gender or ethnicity, or who have physical limitations due to their age or disability that prevent them from responding violently—the precise groups that face persistent discrimination—must endure a higher level of offensive speech before being afforded legal remedies that comport with our constitution. From the speaker's perspective, such a result allows him or her to more readily and viciously verbally assault certain oppressed groups without fear of criminal prosecution.

Although I have strong reservations about the viability and application of the fighting words doctrine because it leads to consideration of stereotypical propensities for violence when assessing an addressee's likely response to the speaker's words, I recognize that the fighting words exception remains binding United

State *v.* Liebenguth

States Supreme Court precedent. As such, I agree with the majority's conclusion that the defendant's use of the phrases "fucking niggers" and to "remember Ferguson" during his encounter with Michael McCargo were likely to provoke a violent response from a reasonable person under the circumstances and, therefore, constituted fighting words not entitled to protection under the first amendment. Although there are no per se fighting words, and statements must be assessed in the context in which they are made, the highly offensive, degrading, and humiliating racial slur that the defendant used is one of the most volatile terms in the English language, and, therefore, it does not stretch logic to conclude that its use in this context would likely cause a reasonable person to respond with violence.

For the foregoing reasons, I respectfully concur.

ECKER, J., concurring. I join the majority opinion because we are bound by United States Supreme Court precedent to apply the fighting words doctrine as currently formulated, and, in my view, the majority reaches the correct result applying that doctrine to the facts of the present case. I write separately lest my silence otherwise be misunderstood as an endorsement of this deeply flawed doctrine.[1] I also wish to draw attention to the looming question that comes into increasingly sharp focus with every decision issued by this court on the topic. That question is whether there may be a more sensible first amendment framework that would better serve to justify the outcome reached today in a manner that fully honors our government's commitment to freedom of speech without, in the process, sacrificing our ability to regulate a narrow category of malicious hate speech—which, for present purposes, may be defined as speech communicated publicly to an addressee, in

---

[1] As will become clear, my concerns share a great deal in common with those expressed by Justice Kahn in her incisive concurring opinion.

State *v.* Liebenguth

a face-to-face encounter, using words or images that demean the addressee on the basis of his or her race, color, national origin, ethnicity, religion, gender, sexual orientation, disability, or like trait, under circumstances indicating that the speaker intends thereby to cause the addressee severe psychic pain. I do not know when the United States Supreme Court will acknowledge that the current doctrine is untenable or whether it will consider replacing it with a reformulated doctrine focused on the government's interest in regulating hate speech. Nor do I know whether such a hate speech doctrine ultimately would pass muster under the first amendment. Sooner or later, however, I believe that it will become necessary to either shift doctrinal paradigms or admit failure because it has become evident that the existing fighting words doctrine does not provide a sound or viable means to draw constitutional lines in this area.

I

I agree wholeheartedly with my colleagues that the words and sentiments expressed by the defendant, David B. Liebenguth, were vile, repugnant and morally reprehensible. He selected his words for their cruelty and used them as a weapon to inflict psychic wounds as painful, or more so, than physical ones. The defendant crossed a particular line that should never be crossed by anyone in America and then crossed that line again by engaging in after-the-fact conduct indicating a complete lack of contrition. See footnote 4 of the majority opinion. The views expressed in this concurring opinion should not be construed in any way to excuse, defend, or otherwise condone the defendant's words or accompanying conduct.

This brings me directly to the point. I believe that we need not scratch too deeply beneath the surface to see that the defendant is being punished criminally for the content of his speech. It is the reprehensible content of the speech that propels our desire to prohibit it.

State *v.* Liebenguth

Indeed, one very particular meaning intended by the defendant's language is behind this prosecution. The criminality of the defendant's speech does not inhere in his use of the word "nigger" itself because that word can mean very different things depending on the identity, race, affiliation, and cultural milieu of the speaker and the addressee. See R. Kennedy, "The David C. Baum Lecture: 'Nigger!' as a Problem in the Law," 2001 U. Ill. L. Rev. 935, 937.[2] The criminality of the defendant's speech derives from his use of the word as a term of oppression, contempt, and debasement rather than affection or brotherhood.

Therein lies the difficulty under the first amendment, because the quintessential teaching of the constitutional prohibition against any law abridging the freedom of speech is that the government cannot proscribe speech

---

[2] Professor Randall L. Kennedy, the author of the acclaimed 2002 book entitled "Nigger: The Strange Career of a Troublesome Word," writes with great learning, sensitivity and sophistication on the subject. He explains the "remarkably protean" nature of the word: "It can mean many things. . . . A weapon of racist oppression, 'nigger' can also be a weapon of antiracist resistance as in Dick Gregory's autobiography entitled Nigger, or H. Rap Brown's polemic Die Nigger Die! An expression of deadening contempt, use of the N-word can also be an assertion of enlivened wit as in Richard Pryor's trenchant album of stand up comedy That Nigger's Crazy. A term of belittlement, 'nigger' can also be a term of respect as in 'James Brown is sho nuff nigger.' . . . A term of hostility, nigger can also be a term of endearment as in 'this is my main nigger'—i.e., my best friend. . . . It might just be, as [the journalist Jarvis Deberry] writes, 'the most versatile and most widely applied intensifier in the English language.' " (Footnotes omitted.) R. Kennedy, supra, 2001 U. Ill. L. Rev. 937; see also A. Perdue & G. Parks, "The Nth Decree: Examining Intraracial Use of the N-Word in Employment Discrimination Cases," 64 DePaul L. Rev. 65, 66 (2014) ("[w]hile some members of the black community . . . publicly embrace [the] use of the N-word by and among blacks as a term of endearment, others . . . still view it exclusively as a tool of racial oppression"). The indomitable Charles Barkley has revealed the politically subversive undercurrent that accompanies some uses of the word: "I use the N-word. I'm going to continue to use the N-word . . . . [W]hat I do with my black friends is not up to white America . . . ." (Internal quotation marks omitted.) A. Perdue & G. Parks, supra, 65–66.

State *v.* Liebenguth

on the basis of content. "[A]bove all else," Justice Thurgood Marshall famously observed, "the [f]irst [a]mendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept.* v. *Mosley*, 408 U.S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972); accord *Brown* v. *Entertainment Merchants Assn.*, 564 U.S. 786, 790–91, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011); *Ashcroft* v. *American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002); see *Reed* v. *Gilbert*, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) ("[c]ontent-based laws—those that target speech based on its communicative content— are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests"); *R. A. V.* v. *St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) ("[t]he [f]irst [a]mendment generally prevents [the] government from proscribing speech . . . or even expressive conduct . . . because of disapproval of the ideas expressed" (citations omitted)); see also footnote 8 of this opinion. Speech that offends, provokes, or disrupts cannot be censored by the government merely because it roils calm waters or contravenes our collective sense of civilized discourse. Although the content of such speech at times may be extremely difficult to tolerate, and its value may be impossible to discern, we must never forget that "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a

336 Conn. 685 JUNE, 2021 729

State *v.* Liebenguth

clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. . . . There is no room under our [c]onstitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.'' (Citations omitted.) *Terminiello* v. *Chicago*, 337 U.S. 1, 4–5, 69 S. Ct. 894, 93 L. Ed. 1131 (1949).

The fighting words doctrine is among the very few exceptions to this rule. ''[T]he [f]irst [a]mendment has 'permitted restrictions upon the content of speech in a few limited areas' '' consisting of '' 'historic and traditional categories long familiar to the bar' . . . including obscenity . . . defamation . . . fraud . . . incitement . . . and speech integral to criminal conduct . . . .'' (Citations omitted.) *United States* v. *Stevens*, 559 U.S. 460, 468, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010); see also *R. A. V.* v. *St. Paul*, supra, 505 U.S. 383, 386 (listing exceptions, including fighting words). The fighting words doctrine, in modified form, appears to remain good law despite widespread criticism and a distinctly underwhelming track record in its place of origin, the United States Supreme Court.[3] See *State* v.

---

[3] Questions arise about the continued vitality of the fighting words doctrine because the United States Supreme Court has not upheld a single criminal conviction under the doctrine since *Chaplinsky* was decided almost eighty years ago. Note, ''The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment,'' 106 Harv. L. Rev. 1129, 1129 (1993). There is no doubt that the doctrine's scope has been narrowed by a series of decisions including, but not by any means limited to, *Cohen* v. *California*, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) (limiting fighting words to personally abusive epithets spoken in direct and personal confrontation), *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result) (indicating that first amendment protection is broader when addressee is police officer, who ''may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words'' (internal quotation marks omitted)), and *R. A. V.* v. *St. Paul*, supra, 505 U.S. 386, 391 (recognizing that fighting words are not devoid of expressive value, describing fighting words doctrine as regulation of '' 'nonspeech' element of communication,'' and holding that statute prohibiting particular fighting

State *v.* Liebenguth

*Parnoff*, 329 Conn. 386, 411, 186 A.3d 640 (2018) (*Kahn,
J.*, concurring in the judgment) ("[t]he continuing vital-
ity of the fighting words exception is dubious and the
successful invocation of that exception is so rare that
it is practically extinct").

I understand that we must adhere to the fighting
words doctrine until the United States Supreme Court
says otherwise. But, although the majority opinion does
an admirable job fashioning a silk purse out of this
particular sow's ear, I believe that we are better off in
the end expressing our concerns openly and displaying
a more determined preference for avoiding further
entanglement with this untenable doctrine.[4] In my view,

words was unconstitutional because it discriminated on basis of viewpoint
of speaker). See, e.g., W. Nevin, " 'Fighting Slurs': Contemporary Fighting
Words and the Question of Criminally Punishable Racial Epithets," 14 First
Amendment L. Rev. 127, 133–38 (2015) (reviewing post-*Chaplinsky* cases
limiting fighting words doctrine); T. Place, "Offensive Speech and the Penn-
sylvania Disorderly Conduct Statute," 12 Temp. Pol. & Civ. Rts. L. Rev. 47,
51–59 (2002) (same); R. Smolla, "Words 'Which By Their Very Utterance
Inflict Injury': The Evolving Treatment of Inherently Dangerous Speech in
Free Speech Law and Theory," 36 Pepp. L. Rev. 317, 350 (2009) (noting that
"the entire mainstream body of modern [f]irst [a]mendment law . . . has
dramatically tightened the rules of immediacy, intent, and likelihood of harm
required to justify restrictions on speech on the theory the speech will lead
to violence" and suggesting that "the 'inflict[s] injury' prong of *Chaplinksy*"
is no longer operative and what remains is "that part of *Chaplinksy* linked
to genuine 'fighting words' and the maintenance of physical (as opposed to
moral) order"). I nonetheless agree with the majority and Justice Kahn that
the fighting words exception to the first amendment has not been overruled
and remains binding on this court.

[4] I do not break any new ground in pointing out these defects. See, e.g.,
B. Caine, "The Trouble With 'Fighting Words': *Chaplinsky* v. *New Hampshire*
Is a Threat to First Amendment Values and Should Be Overruled," 88 Marq.
L. Rev. 441, 444–45 n.6 (2004) ("While I agree with both scholars and others
that *Chaplinsky* ought to be overruled, I must note that the [United States]
Supreme Court has paid little attention to their plea. . . . [*Chaplinsky*] is
so deeply flawed that it cannot stand, and . . . [it] is an intolerable blot
on free speech jurisprudence."); S. Gard, "Fighting Words as Free Speech,"
58 Wash. U. L.Q. 531, 536 (1980) ("the fighting words doctrine is nothing
more than a quaint remnant of an earlier morality that has no place in a
democratic society dedicated to the principle of free expression"); R. O'Neil,
"Hate Speech, Fighting Words, and Beyond—Why American Law Is Unique,"

State *v.* Liebenguth

this court's own engagement with the fighting words doctrine to date has resulted in a series of decisions embedding us more deeply in the doctrinal quicksand each time we undertake the futile task of drawing constitutional distinctions between one person's lyric and another's vulgarity.[5] I fear that the doctrine we have embraced disserves us more than we acknowledge by inducing us to believe, or act as if we believe, that we are able to discern a constitutional line distinguishing one angry person screaming a race-based epithet at a municipal parking enforcement officer from another angry person screaming a gender-based epithet at a store manager. See *State* v. *Baccala*, 326 Conn. 232, 235–36, 256, 163 A.3d 1 (calling assistant manager of grocery store "a 'fat ugly bitch' and a 'cunt' " did not constitute fighting words and, therefore, warranted constitutional protection under first amendment), cert. denied, U.S. , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017).

76 Alb. L. Rev. 467, 471–72 (2012–2013) ("[The] dismissive . . . view of expression [in *Chaplinsky*] that was both unquestionably offensive and provocative now seems not only archaic but also wholly illogical. . . . Seventy years later, *Chaplinsky* remains a persistent source of constitutional confusion. It might have been mercifully overruled long since, but that never happened." (Footnotes omitted.)); W. Reilly, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 948 (2000) ("The [fighting words doctrine] is discriminatory because its application depends on assumptions about how likely a listener is to respond violently to speech. This approach invites judges or juries to determine whether speech is protected by the [f]irst [a]mendment based on their own prejudices about the listener."); M. Mannheimer, Note, "The Fighting Words Doctrine," 93 Colum. L. Rev. 1527, 1558, 1568–71 (1993) (arguing for modification of fighting words doctrine to add scienter requirement); Note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1141 (1993) ("Overruling *Chaplinsky* would eliminate a doctrine that accommodates the undesirable 'male' tendency to come to blows. More [important], eliminating the 'fighting words' doctrine would eradicate a tool that governmental officials may use and have used to harass minority groups and to suppress dissident speech.").

[5] See *Cohen* v. *California*, 403 U.S. 15, 25, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) (recognizing that, under fighting words doctrine, "it is . . . often true that one man's vulgarity is another's lyric").

State *v.* Liebenguth

## II

The profound and intractable problems inherent in the fighting words doctrine become evident the moment we examine the legal standard that our court uses to determine whether a defendant's speech falls within its scope. The majority correctly describes the analysis. Fighting words is speech that is "likely to provoke a violent response under the circumstances in which [the words] were uttered . . . ." Id., 234. The doctrine purports not to be concerned with the content of the speech per se but, rather, the "likelihood of violent retaliation." Id., 240. Thus, unlike the situation described by George Carlin in his classic comedic monologue about government censorship of obscene language, "Seven Words You Can Never Say on Television,"[6] there is no predetermined list of proscribed fighting words or phrases; context is everything. As the majority aptly observes, "there are no per se fighting words because words that are likely to provoke an immediate, violent response when uttered under one set of circumstances may not be likely to trigger such a response when spoken in the context of a different factual scenario." In determining whether the speech in any particular circumstance is constitutionally protected, the person performing the constitutional line drawing must consider "a host of factors," including not only the words themselves, but "the manner and circumstances in which the words were spoken" and "those personal attributes of the speaker and addressee that are reasonably apparent . . . ." *State* v. *Baccala*, supra, 326 Conn. 240–41; see id., 242–43 ("[c]ourts have . . . considered the age, gender, race, and status of the speaker" and "also have taken into account the addressee's age, gender, and race"). This intensely contextualized and fact specific inquiry strives to remain "objective" in nature. Id., 247. For this reason, the issue is not how the actual addressee in fact responds to the speech, but the likely

---

[6] G. Carlin, Class Clown (Little David Records 1972).

State *v.* Liebenguth

response of the *average* person in the addressee's
shoes. Id.; see *Chaplinsky* v. *New Hampshire*, 315 U.S.
568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 (1942) ("the test
[for determining which words are fighting words] is
what men of common intelligence would understand
would be words likely to cause an average addressee
to fight" (internal quotation marks omitted)).

As this description illustrates, the constitutional justi-
fication for the fighting words doctrine, as it operates
today, does *not* rest on the state's interest in protecting
the addressee from the emotional and psychic harm
caused by words "which by their very utterance inflict
injury . . . ."[7] *Chaplinsky* v. *New Hampshire*, supra,

---

[7] *Chaplinsky* defined fighting words as "those which by their very utter-
ance inflict injury or tend to incite an immediate breach of the peace."
*Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 572. The two parts of this
definition have come to be known as the "inflicts injury" prong and the
"breach of peace" or "incitement" prong. It is debatable whether the "inflicts
injury" prong was ever anything more than dictum. See Note, "The Demise
of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment,"
106 Harv. L. Rev. 1129, 1129 (1993) (noting that "the prong of *Chaplinsky*
that exempted words 'which by their very utterance inflict injury'—dictum
in that opinion—has never been used by the [c]ourt to uphold a speaker's
conviction"). In any event, it is generally acknowledged that the "inflicts
injury" prong no longer serves to justify the fighting words exception. See,
e.g., *Purtell* v. *Mason*, 527 F.3d 615, 624 (7th Cir.) ("[a]lthough the 'inflict-
injury' alternative in *Chaplinsky*'s definition of fighting words has never
been expressly overruled, the [United States] Supreme Court has never held
that the government may, consistent with the [f]irst [a]mendment, regulate
or punish speech that causes emotional injury but does not have a tendency
to provoke an immediate breach of the peace" (emphasis omitted)), cert.
denied, 555 U.S. 945, 129 S. Ct. 411, 172 L. Ed. 2d 288 (2008); *Boyle* v.
*Evanchick*, United States District Court, Docket No. 19-3270 (GAM) (E.D.
Pa. March 19, 2020) (noting "[t]he [United States] Supreme Court's retreat
from the broad standard announced in *Chaplinsky*" and abandonment of
the "inflicts injury" prong); *UWM Post, Inc.* v. *Board of Regents*, 774 F.
Supp. 1163, 1170 (E.D. Wis. 1991) ("[s]ince *Chaplinsky*, the [United States]
Supreme Court has . . . limited the fighting words definition so that it now
. . . includes [only the 'incitement' prong]"); *People in the Interest of R.C.*,
411 P.3d 1105, 1108 (Colo. App. 2016) ("soon after *Chaplinsky*, the [United
States] Supreme Court either dropped the 'inflict[s] injury' category of fight-
ing words altogether or recited the full definition of fighting words without
further reference to any distinction between merely hurtful speech and

State *v.* Liebenguth

315 U.S. 572. Instead, the current fighting words doctrine purports to regulate speech on the basis of its *incitement effect*, i.e., the likelihood of inciting the addressee to immediate violence against the speaker. The ascendancy of the incitement rationale as the sole constitutionally legitimate justification for the fighting words doctrine avoids the appearance, discomfiting to some, that the state is censoring speech due solely to the emotional impact that the content of that speech has on the addressee.[8] The allure of the incitement analysis, in other words, lies in its insistence that it is entirely unconcerned with the *content* of the speech

speech that tends to provoke an immediate breach of the peace"), cert. denied, Colorado Supreme Court, Docket No. 16SC987 (November 20, 2017); *State* v. *Drahota*, 280 Neb. 627, 634, 788 N.W.2d 796 (2010) ("the [United States] Supreme Court has largely abandoned *Chaplinsky*'s 'inflict[s] injury' standard"); E. Chemerinsky, Constitutional Law (5th Ed. 2017) § 9 (C) (2) (a), p. 1387 ("the [c]ourt has narrowed the scope of the fighting words doctrine by ruling that it applies only to speech directed at another person that is likely to produce a violent response"); M. Rutzick, "Offensive Language and the Evolution of First Amendment Protection," 9 Harv. C.R.-C.L. L. Rev. 1, 22–27 (1974) (tracing United States Supreme Court's rejection of "inflicts injury" prong in decades since *Chaplinsky*); M. Mannheimer, Note, "The Fighting Words Doctrine," 93 Colum. L. Rev. 1527, 1538–49 (1993) (tracing United States Supreme Court's rejection of "inflicts injury" prong in decades since *Chaplinsky*); Note, supra, 106 Harv. L. Rev. 1137 ("this prong almost certainly has been de facto overruled").

[8] First amendment jurisprudence traditionally recognizes that the government may not censor speech merely because the content or message is insulting or offensive due to its emotional impact on the audience. See, e.g., *Texas* v. *Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) ("[i]f there is a bedrock principle underlying the [f]irst [a]mendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *Cohen* v. *California*, 403 U.S. 15, 25, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) ("Surely the [s]tate has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. . . . [I]t is . . . often true that one man's vulgarity is another's lyric."); cf. R. Kennedy, supra, 2001 U. Ill. L. Rev. 943 ("[t]he [fighting words] doctrine is in tension with the dominant (and good) rule in criminal law that prevents 'mere words standing alone . . . no matter how insulting, offensive, and abusive' from constituting the predicate for a provocation excuse"), quoting *United States* v. *Alexander*, 471 F.2d 923, 941 n.48 (D.C. Cir.), cert. denied sub nom. *Murdock* v. *United States*, 409 U.S. 1044, 93 S. Ct. 541, 34 L. Ed. 2d 494 (1972).

State *v.* Liebenguth

under review and regulates solely on the basis of the
"nonspeech" element of the communication. See *R. A. V.*
v. *St. Paul*, supra, 505 U.S. 386.

Serious problems arise, however, when we use the
fighting words exception to regulate offensive speech
under the rubric of the incitement rationale. Fighting
words is an unusual subcategory of incitement speech—
the speaker and listener are adversaries rather than
coconspirators, and the speaker ordinarily is not *advo-
cating* violence but, rather, speaking words in a manner
likely to stimulate the listener's anger to the boiling
point.[9] The fighting words doctrine permits the govern-
ment to prohibit speech that the government deems
likely to incite a physical attack by the addressee *on
the speaker himself*. Put another way, this category of
speech loses its constitutional protection because it is
deemed likely to "cause" another person to punch the
speaker in the nose (or worse)—a distinctly counterin-

---

[9] The incitement analysis has its origins in cases in which a speaker faces
criminal prosecution or civil liability for advocating unlawful conduct. See,
e.g., *Brandenburg* v. *Ohio*, 395 U.S. 444, 444–45, 89 S. Ct. 1827, 23 L. Ed.
2d 430 (1969) (speech allegedly advocating hate group to engage in racial
violence); *Schenck* v. *United States*, 249 U.S. 47, 48–50, 39 S. Ct. 247, 63 L.
Ed. 470 (1919) (speech advocating reader to resist military conscription);
cf. *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 927, 102 S. Ct. 3409,
73 L. Ed. 2d 1215 (1982) (applying *Brandenburg* test to speech allegedly
inciting group to cause property damage). Under the *Brandenburg* "incite-
ment" analysis, speech loses its constitutional protection only if it is (1)
"directed to inciting or producing imminent lawless action," *and* (2) "likely
to incite or produce such action." *Brandenburg* v. *Ohio*, supra, 447. The
fighting words doctrine, unlike the *Brandenburg* incitement analysis, con-
tains no intent requirement. See C. Calvert, "First Amendment Envelope
Pushers: Revisiting the Incitement-to-Violence Test with Messrs. Branden-
burg, Trump, & Spencer," 51 Conn. L. Rev. 117, 131–32 (2019) ("[i]n contrast
to *Brandenburg*, the [c]ourt's test for another unprotected category of
speech related to violence—fighting words—lacks an intent element"); M.
Mannheimer, Note, "The Fighting Words Doctrine," 93 Colum. L. Rev. 1527,
1557 (1993) (observing that fighting words doctrine does not contain "a true
incitement requirement because [it] fail[s] to require a critical component
of the *Brandenburg* incitement standard—the intent of the speaker to cause
violence").

State *v.* Liebenguth

tuitive justification for withdrawing constitutional protection from the speaker. See *Feiner* v. *New York*, 340 U.S. 315, 327 n.9, 71 S. Ct. 303, 95 L. Ed. 295 (1951) (Black, J., dissenting) (''[T]he threat of one person to assault a speaker does not justify suppression of the speech. There are obvious available alternative methods of preserving public order. One of these is to arrest the person who threatens an assault.''); B. Caine, ''The Trouble with 'Fighting Words': *Chaplinsky* v. *New Hampshire* Is a Threat to First Amendment Values and Should Be Overruled,'' 88 Marq. L. Rev. 441, 507 (2004) (''[p]unishing the speaker for the violence committed against the speaker is totally at odds with [first amendment principles]''); R. Kennedy, supra, 2001 U. Ill. L. Rev. 942 (''Rather than insisting that the target of the speech control himself, the doctrine tells the offensive speaker to shut up. This is odd and objectionable.'').

I wish to focus on two of the most fundamental problems that infect the doctrine as it has been applied in Connecticut. First, as Justice Kahn observes in her concurring opinion, one of the foremost flaws inherent in the fighting words doctrine is that its application turns on the adjudicator's assessment of the addressee's physical ability and psychological or emotional proclivity to respond with violence to the speaker's insulting words. The majority's description of the required legal analysis frankly acknowledges its focus on the speaker's and the addressee's respective age, race, gender, physical condition, and similar characteristics. The doctrine thus confers or withdraws constitutional protection depending on the demographic characteristics of the relevant individuals; vicious and vile words spoken by ''a child, a frail elderly person, or a seriously disabled person'' may be protected under the first amendment because ''social conventions . . . [or] special legal protections . . . could temper the likelihood of a violent response . . . .'' *State* v. *Baccala*, supra, 326 Conn. 242. And most important, as the majority, quoting *State* v.

State *v.* Liebenguth

*Baccala*, supra, 249, acknowledges, " 'an unfortunate but necessary' " part of the constitutional analysis is an assessment of the *addressee's* physical abilities and aggressive tendencies to determine whether the addressee is " 'likely to respond violently . . . .' "

"Unfortunate" is a vast understatement. The fighting words doctrine invites—even requires—stereotyping on the basis of age, gender, race, and whatever other demographic characteristics the adjudicator explicitly or implicitly relies on to decide whether a person is likely to respond to offensive language with immediate violence. In my view, a bright red light should flash when our first amendment doctrine leads us to conclude, for example, that an outrageous slur directed at a physically disabled elderly woman is constitutionally protected but the identical words addressed to a physically fit man walking down the sidewalk will subject the speaker to criminal prosecution. It is no wonder that the fighting words doctrine is considered by many critics to represent a "hopeless anachronism that mimics the macho code of barroom brawls." K. Sullivan, "The First Amendment Wars," New Republic, September 28, 1992, p. 40; id. (observing that fighting words doctrine "give[s] more license to insult Mother Teresa than Sean Penn just because she is not likely to throw a punch"); see A. Carr, "Anger, Gender, Race, and the Limits of Free Speech Protection," 31 Hastings Women's L.J. 211, 227 (2020) (describing *Chaplinsky* as reflecting "a gendered . . . perspective" enshrining "a 'hypermasculine' exemption from presumed 'gentlemanly' expectations of conduct among men"); S. Gard, "Fighting Words as Free Speech," 58 Wash. U. L.Q. 531, 536 (1980) (opining that fighting words doctrine represents "a quaint remnant of an earlier morality that has no place in a democratic society"); K. Greenawalt, "Insults and Epithets: Are They Protected Speech?," 42 Rutgers L. Rev. 287, 293 (1990) ("Many speakers who want to humiliate and wound would also welcome a fight. But in many of the

State *v.* Liebenguth

cruelest instances in which abusive words are used, no
fight is contemplated: white adults shout epithets at
black children walking to an integrated school; strong
men insult much smaller women.''); R. Kennedy, supra,
2001 U. Ill. L. Rev. 943 (fighting words doctrine "gives
more leeway to insult a nun than a prizefighter because
she is less likely to retaliate''); W. Reilly, "Fighting the
Fighting Words Standard: A Call for Its Destruction," 52
Rutgers L. Rev. 947, 956 (2000) (observing that fighting
words doctrine permits "speech to be [regulated] . . .
when directed at someone who would react violently
to a verbal assault, but [prohibits regulation] . . .
when directed at someone with a more pacific bent'').[10]

---

[10] Professor Kathleen Sullivan is correct to label the doctrine gendered
and anachronistic, although its historical roots trace back to the nineteenth
century gentlemanly ritual of the duel rather than the timeless working-
class custom of barroom brawling. Ironically, as Professor Jeffrey Rosen
has observed, "[t]he [social] foundation of the [fighting words] doctrine had
collapsed long before the [United States] Supreme Court enshrined it as
marginal constitutional law in 1942 [in *Chaplinksy*].'' J. Rosen, "Fighting
Words,'' Legal Affairs, May/June, 2002, p. 18. "Legal bans on fighting words,''
explains Rosen, "grew out of the [nineteenth century] efforts to discourage
the practice of dueling, and they evolved from a [class-based] culture of
honor and hierarchy'' that we would no longer recognize in contemporary
America. Id., p. 16. The concept of fighting words emanates from a "highly
ritualized code of honor [that] led American gentlemen in the [nineteenth]
century to fight duels, to prove their social status and worthiness for leader-
ship. . . . [D]ueling depended on a strong consensus about the social peck-
ing order. If you were insulted by a social equal, you redeemed your honor
by challenging him to a duel. If you wanted to insult a social inferior, you
displayed your contempt by bludgeoning him with a cane. In a culture based
on honor, there was broad agreement about what kinds of insults could be
avenged only by demanding satisfaction in a duel.'' Id. States attempted—
apparently with little success—to put an end to this cultural artifact by
enacting laws criminalizing the utterance of words considered so insulting
as to necessitate a violent response. Id.; see also K. Greenberg, Honor and
Slavery (Princeton University Press 1996) c. 1, pp. 14–15 (discussing history
of antidueling laws); J. Freeman, Affairs of Honor (Yale University Press
2001) c. 4, pp. 159–198 (discussing social meaning and national importance
of dueling in America during early nineteenth century). Professor Freeman's
discussion in particular demonstrates that participation in these "affairs of
honor'' was not considered optional. See J. Freeman, supra, pp. 159–164
(discussing Alexander Hamilton's tormented desire to avoid proceeding with
duel demanded by Aaron Burr and Hamilton's reluctant conclusion that duel
was impossible to avoid). "The laws of honor,'' writes Professor Freeman,
"indicated when insults could not be ignored . . . .'' Id., p. 171. Our country's

State *v.* Liebenguth

The doctrine in no way avoids this analytical abyss by focusing its inquiry on the personal characteristics of the "average" addressee rather than the actual listener. To the contrary, styling the test in faux objective garb only makes things worse because there is no empirical basis for such an inquiry; no such average person exists, no metric for assessment exists, and, to the best of my knowledge, nothing that we would consider valid social science is available to assist the decision maker. The first amendment becomes a Rorschach blot onto which the adjudicating authority (and, before it reaches the adjudicator, the arresting officer and state prosecutor) projects his or her own stereotypes, preconceptions, biases and fantasies about race, ethnicity, sexual orientation, gender, religion, and other "identity" characteristics of the addressee to decide whether a person with those demographics probably would react with immediate violence.[11] This is especially the case when

dominant social code no longer compels us to defend our honor with violence; to the contrary, it is considered honorable to respond to insults by walking away, as the parking enforcement officer, Michael McCargo, did in the present case.

[11] There is a substantial body of social science literature on implicit bias, which is generally defined as subconscious "stereotypes and prejudices that can negatively and nonconsciously affect behavior . . . ." L. Richardson, "Arrest Efficiency and the Fourth Amendment," 95 Minn. L. Rev. 2035, 2039 (2011). One such implicit bias "consists of the cultural stereotype of blacks, especially young men, as violent, hostile, aggressive, and dangerous." Id.; see also A. Rutbeck-Goldman & L. Richardson, "Race and Objective Reasonableness in Use of Force Cases: An Introduction to Some Relevant Social Science," 8 Ala. C.R. & C.L. L. Rev. 145, 149 (2017) ("[s]ocial science research over the last few decades suggests that we unconsciously associate [b]lack men with danger, criminality, and violence"). Implicit biases "linking [b]lacks with aggression have been shown to cause people to judge the behavior of a [b]lack person as more aggressive than the identical behavior of a [w]hite person," leading to higher rates of police violence and incarceration. K. Spencer et al., "Implicit Bias and Policing," 10 Soc. & Personality Psychol. Compass 50, 54 (2016); see also L. Richardson, supra, 2039 ("As a result of implicit biases, an officer might evaluate behaviors engaged in by individuals who appear black as suspicious even as identical behavior by those who appear white would go unnoticed. In other words, even when officers are not intentionally engaged in conscious racial profiling, implicit biases can lead to a lower threshold for finding identical behavior suspicious when engaged in by blacks than by whites."). Implicit biases are not limited to race; they also perpetuate subconscious gender stereotypes. Many individu-

State *v.* Liebenguth

it comes to the predominant twenty-first century brand of insults, epithets, and slurs, which so often target the group identity of the addressee. The fighting words doctrine in its current form confers or withdraws first amendment protection on the basis of nothing more substantial than our own stereotypes and biases regarding those very demographic features. This is "I know it when I see it" run amuck.[12]

The sharp contrast between this court's holdings in *Baccala* and the present case demonstrate the point. The majority does its best to distinguish *Baccala* on some basis other than gender and race, but the stark

als view women as "meek or submissive"; J. Cuevas & T. Jacobi, "The Hidden Psychology of Constitutional Criminal Procedure," 37 Cardozo L. Rev. 2161, 2181 (2016); and, thus, not prone to engage in violent behavior. This is not true, however, for women of color. Black women are often viewed as "hot-tempered, combative, and uncooperative," leading to higher rates of police violence and incarceration. F. Freeman, Note, "Do I Look Like I Have an Attitude? How Stereotypes of Black Women on Television Adversely Impact Black Female Defendants Through the Implicit Bias of Jurors," 11 Drexel L. Rev. 651, 655 (2019); see also N. Amuchie, " 'The Forgotten Victims' How Racialized Gender Stereotypes Lead to Police Violence Against Black Women and Girls: Incorporating an Analysis of Police Violence into Feminist Jurisprudence and Community Activism," 14 Seattle J. Soc. Just. 617, 646 (2016) ("[b]lack women and girls are viewed as [nonfeminine] or [unladylike], which leads to high levels of violence against them and excessive policing"). America, of course, has no monopoly on group stereotypes of this nature. See, e.g., P. Lerner et al., "Introduction: German Jews, Gender, and History," in Jewish Masculinities (B. Baader et al. eds., 2012) p. 1 ("[t]he idea that Jewish men differ from non-Jewish men by being delicate, meek, or effeminate in body and character runs deep in European history").

[12] See *Jacobellis* v. *Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964) (Stewart, J., concurring) (confessing his inability to define pornography in words but explaining that "I know it when I see it"). Justice Potter Stewart's candor is admirable and refreshing, but it is also troubling to those who believe that "the exercise of judicial power is not legitimate if it is based . . . on subjective will rather than objective analysis, on emotion [or instinct] rather than reasoned reflection." P. Gewirtz, Essay, "On 'I Know It When I See It,' " 105 Yale L.J. 1023, 1025 (1996). Some commentators, including Professor Gewirtz, consider such criticism unfair on the ground that it "mischaracterizes and understates the role that emotion and nonrational elements properly play in forming judicial [decision-making and opinion writing]." Id. I am not unsympathetic to Professor Gewirtz' general point, but my heart and mind are in agreement that "I know it when I see it" jurisprudence has no place in first amendment law.

336 Conn. 685　　　JUNE, 2021　　　741

State *v.* Liebenguth

reality of differential treatment remains.[13] In my view, the various distinctions drawn between that case and

[13] To cite one illustrative example of what I consider the unconvincing arguments offered by the majority to explain why the offensive speech was protected in *Baccala* but not here, the majority compares the nature of the addressee's job as an assistant store manager in *Baccala* to that of Michael McCargo, the parking enforcement officer in the present case, and opines that the store employee's supervisory status made her more likely to "[model] appropriate, responsive behavior, aimed at de-escalating the situation . . . ." (Internal quotation marks omitted.), quoting *State* v. *Baccala*, supra, 326 Conn. 253. Unlike the majority, I would place far greater weight on the fact that the addressee in this case was a government employee, not a private individual, as in *Baccala*. This factor, though not dispositive, traditionally and commonsensically weighs strongly in favor of according the speaker greater first amendment protection. See, e.g., *Houston* v. *Hill*, 482 U.S. 451, 462, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) ("a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words" (internal quotation marks omitted)), quoting *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result); *United States* v. *Poocha*, 259 F.3d 1077, 1081 (9th Cir. 2001) ("the area of speech unprotected as fighting words is at its narrowest, if indeed it exists at all, with respect to criminal prosecution for speech directed at public officials"); *Abudiab* v. *San Francisco*, 833 F. Supp. 2d 1168, 1175 (N.D. Cal. 2011) (parking control officer, "as a public official whose duties often incite the vitriol of the public, and who consequently is authorized to use force against members of the public (deployment of pepper spray in self-defense) . . . should be held to a higher standard of conduct in terms of his reaction to mere criticisms, profane and otherwise, of the manner in which he conducts his official duties"), aff'd sub nom. *Abudiab* v. *Georgopoulos*, 586 Fed. Appx. 685 (9th Cir. 2013); *In re Nickolas S.*, 226 Ariz. 182, 188, 245 P.3d 446 (2011) ("a student's profane and insulting outburst" was not fighting words because "Arizona teachers exemplify a higher level of professionalism"); *State* v. *Baccala*, supra, 326 Conn. 244 ("a majority of courts, including ours, hold police officers to a higher standard than ordinary citizens when determining the likelihood of a violent response by the addressee"). To be sure, McCargo was not a police officer, but he was employed as an agent of the government to walk the streets imposing monetary fines on members of the public for municipal parking violations. Parking enforcement officers, as the bearers of bad news, are in a very unpopular line of work and can expect to be subjected to varying levels of verbal abuse. See, e.g., T. Barrett, The Dangerous Life of a Parking Cop, The Tyee (April 2, 2004), available at https://thetyee.ca/Life/2004/04/02/The_Dangerous_Life_of_a_Parking_Cop/ (last visited August 26, 2020) (reviewing film about "the life of a parking enforcement officer," who explained that "physical assaults are rare, but verbal abuse is something that happens almost every day"); J. McKinley, "San Franciscans Hurl Their Rage at Parking Patrol," N.Y. Times, January 6, 2007, p. A12 (abuse on parking control officers is "common, often frightening and, occasionally, humiliating").

State *v.* Liebenguth

the present case, though unquestionably reflecting the good-faith assessment of the subscribing justices, reinforce rather than remove valid concerns regarding the arbitrary, subjective, and gendered nature of the fighting words doctrine. An observer would be excused for thinking that these outcomes reflect, and may tend to perpetuate, nothing more substantial than our deeply ingrained stereotypes regarding the traditional gender traits of the "average" woman, at least the "average" white woman. See footnote 11 of this opinion.[14]

The potential for discriminatory enforcement, or at the very least the perception that a "realistic possibility that official suppression of ideas is afoot," is anathema to our most fundamental first amendment values. *R. A. V.* v. *St. Paul*, supra, 505 U.S. 390. In the hands of even the most responsible police officers, prosecutors, judges and juries, this legal standard is sure to produce incongruous and inexplicable results, even if all participants—including the speaker and the addressee—share

---

[14] The particular facts of the present case, and our consensus regarding the correct result here, ought not obscure the reality that demographic stereotypes and implicit biases relating to race will continue to plague this doctrine. Conscious or unconscious racial stereotypes help to explain why some speech is deemed likely to incite violence, whereas other speech is not. See, e.g., A. Carr, supra, 31 Hastings Women's L.J. 229–30 ("For nonwhite Americans, racist stereotypes and diverging governmental and cultural norms about expressing public anger compound the complexities of [speech regulation]. Moreover, the state's responses to different individuals and groups' public displays of anger—as in protest actions—vary on the basis of race. For example, the recent cases of mass protests in Ferguson [Missouri, in 2014] and the Women's Marches (2017 onward) displayed enormous disparities: police responses to the [majority black] protesters in Ferguson were militarized and violent compared to the anodyne permissiveness of authorities toward the visibly white Women's March organizers and attendees. . . . Those [state individual] contexts include, among others, racist patterns of policing and incarceration, as well as profoundly asymmetric rates of arrest and prosecution. These considerations form a daunting backdrop for nonwhite (and non-male) listeners . . . in ways not contemplated by the [c]ourt in *Chaplinsky* and later cases. Black and brown Americans have myriad deeply rooted claims for condemning state authorities, for angrily castigating them in terms far harsher than Chaplinsky's censured utterance, but they also face far greater chances of harm if they choose to do so. Censure limits free speech rights; speaking out against racist systems often deprives speakers of color their very lives." (Footnotes omitted.)).

State *v.* Liebenguth

a relatively homogenous set of cultural norms and expectations. Under the auspices of less enlightened administrating authorities, the doctrine, in my view, "contains an obvious invitation to discriminatory enforcement . . . ." (Internal quotation marks omitted.) *Houston* v. *Hill*, 482 U.S. 451, 465 n.15, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). The wide degree of subjectivity necessitated by the legal standard "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure' ''; *Papachristou* v. *Jacksonville*, 405 U.S. 156, 170, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972), quoting *Thornhill* v. *Alabama*, 310 U.S. 88, 97–98, 60 S. Ct. 736, 84 L. Ed. 1093 (1940); and "confers on [the] police a virtually unrestrained power to arrest and charge persons with a violation." *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result).

This brings me to the second fundamental problem with the fighting words doctrine, which is that such an intensely contextualized, fact specific, and inherently subjective analysis in the area of free speech creates major constitutional concerns under due process vagueness principles. The underlying vice addressed by the void for vagueness doctrine is basic to the rule of law: "As generally stated, the [void for vagueness] doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the court has] recognized recently that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine— the requirement that a legislature establish minimal

State *v.* Liebenguth

guidelines to govern law enforcement.' . . . Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' '' (Citations omitted.) *Kolender* v. *Lawson*, 461 U.S. 352, 357–58, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983); see also *Grayned* v. *Rockford*, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) (''It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, [when] a vague statute abut[s] upon sensitive areas of basic [f]irst [a]mendment freedoms, it operates to inhibit the exercise of [those] freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.'' (Footnotes omitted; internal quotation marks omitted.)).

The defendant in the present case has not challenged General Statutes § 53a-181 (a) (5) on vagueness grounds, and, accordingly, it is not necessary or appropriate at this time to decide whether the statute is saved by this court's narrowing construction, which limits its coverage to fighting words as we have defined that term in

State *v.* Liebenguth

the prescribed analysis.[15] In my opinion, our recent decisions, including the decision issued today, have not made that future task any easier.

To summarize, the facts of the present case obscure the mischief inherent in the fighting words doctrine, as applied by this court. I feel confident that every judge in Connecticut would agree without reservation that the particular words spoken by the defendant occupy a singular category of offensive content as a result of our country's history. They are unique in their brutality. I therefore agree fully with the view expressed by Judge Devlin that "angrily calling an African-American man a 'fucking [nigger]' after taunting him with references to a recent police shooting of a young African-American man by a white police officer" must fall within the scope of the fighting words doctrine. *State* v. *Liebenguth*, 181 Conn. App. 37, 68, 186 A.3d 39 (2018) (*Devlin, J.*, concurring in part and dissenting in part). But, for the reasons set forth in this concurring opinion, I also believe that the fighting words doctrine does not provide a sensible way to determine the circumstances under which the government may prosecute the utterance of such vile and repugnant speech.

III

This court's own recent experience applying the fighting words doctrine, as well as the many similar cases

---

[15] I doubt that anyone would dispute that the actual statutory language promulgated by our legislature, which criminalizes the use of "abusive or obscene language" in a public place "with intent to cause inconvenience, annoyance or alarm"; General Statutes § 53a-181 (a) (5); plainly cannot pass muster under the void for vagueness doctrine without the aid of a workable narrowing construction. See *Gooding* v. *Wilson*, 405 U.S. 518, 523, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972) (striking down Georgia's breach of peace statute in absence of such limiting construction while observing that "[its] decisions since *Chaplinsky* have continued to recognize state power constitutionally to punish 'fighting' words under carefully drawn statutes not also susceptible of application to protected expression"); see also *Plummer* v. *Columbus*, 414 U.S. 2, 2–3, 94 S. Ct. 17, 38 L. Ed. 2d 3 (1973) (striking down municipal ordinance providing that "[n]o person shall abuse another by

State *v.* Liebenguth

adjudicated by state courts around the country, powerfully illustrates why the United States Supreme Court should consider fashioning a more defensible and administrable first amendment framework for deciding when the government may criminalize the kind of hate speech uttered by the defendant in the present case. To best serve its purpose, the reformulated doctrine should directly confront the fundamental constitutional issue underlying many of these cases, which is whether and under what circumstances the first amendment permits the government to protect its citizenry from the kind of psychic and emotional harm that results when a speaker with malicious intent subjects another person to outrageously degrading slurs in a personal, face-to-face encounter. I cannot predict the outcome of such a doctrinal reexamination, but, in my view, it would benefit us all if the Supreme Court undertakes the challenge before too long. Our current doctrine, operating by indirection and proxy through a hypothetical, stereotype-driven assessment of the likelihood that the words will incite violence, is as unworthy as it is unworkable, and every new case decided under its purview creates additional cause for concern.

In the meantime, I agree with the majority that, under our current first amendment case law, if anything is fighting words, then the words spoken by this defendant under these factual circumstances fit the bill. I concur in the majority opinion for this reason.

_____

using menacing, insulting, slanderous, or profane language'' (internal quotation marks omitted)).